No. 14-5018
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____


JACQUELINE HALBIG, *et al.*,
Plaintiffs - Appellants,


v.


KATHLEEN SEBELIUS,
SECRETARY OF HEALTH AND HUMAN SERVICES, *et al.*,
Defendants - Appellees.

_____


On Appeal from the United States District Court for the District of Columbia
No. 13-cv-623-PLF
_____

***AMICI CURIAE* BRIEF OF PACIFIC RESEARCH INSTITUTE
AND THE CATO INSTITUTE IN SUPPORT OF APPELLANTS**
_____

C. Dean McGrath, Jr.
MCGRATH & ASSOCIATES
1025 Thomas Jefferson St., N.W.
Suite 110G
Washington, DC  20007
Tel: (202) 295-2304

Ilya Shapiro
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20036
Tel: (202) 842-0200

Dated: February 6, 2014

Bert W. Rein*
William S. Consovoy
J. Michael Connolly
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
Email: brein@wileyrein.com


*Counsel of Record

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the Pacific Research Institute and the Cato Institute certify that:

### (A)  Parties and *Amici*

In addition to the parties and *amici* listed in the Appellants' Opening Brief, the following *amici* may have an interest in the outcome of this case:

The Pacific Research Institute

The Cato Institute

### (B)  Rulings under Review

References to the rulings at issue appear in the Appellants' Opening Brief.

### (C) Related Cases

References to the related cases appear in the Appellants' Opening Brief.

s/ Bert W. Rein

Bert W. Rein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
Email: brein@wileyrein.com

*Counsel for Amici Curiae*

<u>**STATEMENT REGARDING CONSENT TO FILE**</u>
<u>**AND SEPARATE BRIEFING**</u>

All parties have consented to the filing of this brief.[1] The Pacific Research Institute ("PRI") and the Cato Institute ("Cato") filed notice of their intent to participate as *amici curiae* on January 30, 2014.

Pursuant to D.C. Circuit Rule 29(d), *amici curiae* certify that a separate brief is necessary because no other *amicus* brief of which we are aware will address the issues raised in this brief: namely, whether the district court improperly elevated legislative purpose over the statute's plain meaning and, more broadly, whether the separation of powers and principles of delegation compelled the district court to enforce the plain meaning of the statutory text.  To our knowledge, we are the only non-partisan, public-interest groups submitting a brief in support of Appellants. In light of *Amici*'s activities, discussed more fully herein, we are particularly well-suited to discuss the important constitutional and statutory issues implicated by the district court's decision.

---

[1]     Pursuant to Fed. R. App. P. 29(c), *amici curiae* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rules 26.1 and 29(b), *amici curiae* Pacific Research Institute ("PRI") and the Cato Institute ("Cato") hereby submit the following corporate disclosure statements:

PRI is a nonprofit 501(c)(3) organization. PRI is not a publicly held corporation and no corporation or other publicly held entity owns more than 10% of its stock.

Cato is a nonprofit corporation organized under the laws of Kansas. Cato has no parent corporation, and no company owns 10 percent or more of its stock.

s/ Bert W. Rein

Bert W. Rein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
Email: brein@wileyrein.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

STATEMENT REGARDING CONSENT TO FILE  AND SEPARATE
      BRIEFING ................................................................................ ii

CORPORATE DISCLOSURE STATEMENT ..................................... iii

TABLE OF AUTHORITIES .............................................................v

GLOSSARY...................................................................................xi

INTEREST OF *AMICI CURIAE* .....................................................1

SUMMARY OF THE ARGUMENT ...................................................2

ARGUMENT ................................................................................5

I.      THE DISTRICT COURT IMPROPERLY ELEVATED ITS
        PERCEPTION OF CONGRESS'S PURPOSE OVER THE ACA'S
        PLAIN MEANING.................................................................5

II.     ARTICLE III OF THE CONSTITUTION DOES NOT EMPOWER
        THIS COURT TO REWRITE THE ACA TO ENSURE THAT IT
        FULFILLS CONGRESSIONAL OBJECTIVES NOT SET FORTH
        IN THE STATUTORY TEXT. ..................................................13

III.    THE IRS HAS NO MORE AUTHORITY THAN THIS COURT TO
        USURP CONGRESS'S LAWMAKING AUTHORITY TO ENSURE
        THAT TAX CREDITS ARE AVAILABLE FOR THOSE
        PURCHASING INSURANCE THROUGH FEDERAL
        EXCHANGES. ......................................................................22

CONCLUSION .............................................................................26

CERTIFICATE OF COMPLIANCE...................................................27

CERTIFICATE OF SERVICE ..........................................................28

# TABLE OF AUTHORITIES

**Page**

**Cases***

*14 Penn Plaza LLC v. Pyett*,
   556 U.S. 247 (2009)......................................................................8

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013).....................................................24

*Alden v. Maine*,
   527 U.S. 706 (1999)....................................................................17

*Aldridge v. Williams*,
   44 U.S. 9 (1845)............................................................................8

*Ali v. Federal Bureau of Prisons*,
   552 U.S. 214 (2008)....................................................................22

*American Land Title Ass'n v. Board of Governors*
   *of Federal Reserve System*,
   892 F.2d 1059 (D.C. Cir. 1989)...................................................25

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946)....................................................................18

*Argentina v. Welover, Inc.*,
   504 U.S. 607 (1992)......................................................................8

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*,
   516 U.S. 264 (1996)......................................................................9

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002)...............................................12, 13, 20, 21

*Bate Refrigerating Co. v. Sulzberger*,
   157 U.S. 1 (1895)........................................................................15

*BedRoc Ltd., LLC v. United States*,
   541 U.S. 176 (2004)...............................................................5, 6, 8

* Authorities upon which we chiefly rely are marked with asterisks.

v

*Burrage v. United States*,
   --- S. Ct. ---, 2014 WL 273243 (Jan. 27, 2014) ...................................................15

*Chevron United States, Inc. v. NRCD*,
   467 U.S. 837 (1984) .........................................................................................23

*Chisholm v. Georgia*,
   2 U.S. 419 (1793) ..............................................................................................17

*City of Arlington, Texas v. FCC*,
   133 S. Ct. 1863 (2013) ...............................................................................22, 25

*City of Joliet, Illinois v. New West, L.P.*,
   562 F.3d 830 (7th Cir. 2009) ............................................................................14

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ....................................................................................21, 23

*Commissioner v. Lundy*,
   516 U.S. 235 (1996) .........................................................................................15

* *Connecticut National Bank v. Germain*,
   503 U.S. 249 (1992) .......................................................................................6, 8

*Engine Manufacturers. Association v. EPA*,
   88 F.3d 1075 (D.C. Cir. 1995) ...................................................................13, 14

*Exxon Mobil Corp. & Affiliated Companies v. C.I.R.*,
   136 T.C. 99 (T.C. 2011) ...................................................................................19

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .........................................................................................22

*Ford Motor Credit Co. v. Milhollin*,
   444 U.S. 555 (1980) .........................................................................................22

*Freeman v. Quicken Loans, Inc.*,
   132 S. Ct. 2034 (2012) .......................................................................................9

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982) .........................................................................................10

vi

*Hans v. Louisiana,*
  134 U.S. 1 (1890) .......................................................................17, 18

*Helvering v. Nw. Steel Rolling Mills, Inc.,*
  311 U.S. 46 (1940) .............................................................................6

*Iselin v. United States,*
  270 U.S. 245 (1926) ...........................................................................15

*\* Lamie v. United States Trustees,*
  540 U.S. 526 (2004) ...........................................................................16

*Landstar Express America, Inc. v. Federal Maritime Commission,*
  569 F.3d 493 (D.C. Cir. 2009) .......................................................23, 24

*Ledbetter v. Goodyear Tire & Rubber Co.,*
  550 U.S. 618 (2007) ...........................................................................19

*Lewis v. City of Chicago, Illinois,*
  560 U.S. 205 (2010) ...........................................................................16

*License Tax Cases,*
  72 U.S. 462 (1866) .............................................................................14

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ...........................................................26

*Mohamad v. Palestinian Authority,*
  132 S. Ct. 1702 (2012) .........................................................................8

*Oncale v. Sundowner Offshore Services, Inc.,*
  523 U.S. 75 (1998) ...............................................................................9

*Paddock v. United States,*
  280 F.2d 563 (2d Cir. 1960) .............................................................20

*Pension Benefit Guaranty Corp. v. LTV Corp.,*
  496 U.S. 633 (1990) ...........................................................................10

*Public Citizen v. NRC,*
  901 F.2d 147 (D.C. Cir. 1990) ...........................................................24

*Puerto Rico Department of Consumer Affairs v. ISLA Petroleum Corp.*,
    485 U.S. 495 (1988)..................................................................8

*Railway Employee Department v. Hanson*,
    351 U.S. 225 (1956)................................................................14

*Ratzlaf v. United States,*
    510 U.S. 135 (1994)..................................................................8

*Republic of Argentina v. Wetlover, Inc.*,
    504 U.S. 607 (1992)..................................................................8

*Robbins v. Chronister,*
    435 F.3d 1238 (10th Cir. 2006) ............................................13, 14, 15

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997)..................................................................6

*Rodriguez v. United States*,
    480 U.S. 522 (1987)................................................................10

*Rubin v. United States,*
    449 U.S. 424 (1981)..................................................................6

*Sandifer v. United States Steel Corp.*,
    --- S. Ct.---, 2014 WL 273241 (Jan. 27, 2014)................................18

*Sorrells v. United States*,
    287 U.S. 435 (1932)................................................................17

*Sundance Associates, Inc. v. Reno*,
    139 F.3d 804 (10th Cir. 1998) ..............................................23

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978)................................................................14

*Terrell v. United States*,
    564 F.3d 442 (6th Cir. 2009) ................................................23

*United States v. Locke,*
    471 U.S. 84 (1985)................................................................16

*United States v. McFerrin*,
   570 U.S. 672 (2009)...........................................................................6

*United States v. Villanueva-Sotelo*,
   515 F.3d 1234 (D.C. Cir. 2008)........................................................6

*West Virginia University Hospitals, Inc. v. Casey*,
   499 U.S. 83 (1991).............................................................................16

**Statutes**

26 U.S.C. § 36B(a).....................................................................................5

26 U.S.C. § 36B(b)(1)................................................................................5

26 U.S.C. § 36B(c)(2)(A)(i).......................................................................5

29 U.S.C. § 251..........................................................................................18

61 Stat. 84 (1947).......................................................................................18

Pub. L. No. 97-448 , 96 Stat. 2365 (1983)................................................20

Pub. L. No. 100-647, 102 Stat. 3342 (1998)..............................................20

Pub. L. No. 105-206, 112 Stat. 790 (1998)................................................19

Pub. L. No. 109-135, 119 Stat. 2610 (2005)..............................................19

Pub. L. No. 110-172, 121 Stat. 2473 (2007)..............................................19

Pub. L. No. 111-2, 123 Stat. 5 (2009).......................................................19

**Legislative Materials**

H.R. Res. 1225, 111th Cong. (March 25, 2010)........................................12

**Other Authorities**

Democratic Leader Nancy Pelosi, News Room: Speeches, http://www.
   democraticleader.gov/news/press/pelosi-remarks-2010-legislative-conference-
   national-association-counties (last visited Feb. 5, 2014)....................12

Federalist No. 78 (A. Hamilton) (Jacob E. Cooke ed., 1961)..................14

Frank H. Easterbrook, Foreword to *Reading Law: The Interpretation of Legal Texts*, Antonin Scalia & Bryan A. Garner (1st ed. 2012)....................................9

John Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedures Shapes Legislative History*, 105 Law Libr. J. 131 (2013) ...............................................................11

John C. Nagle, *Corrections Day*, 43 UCLA L. Rev. 1267 (1996)..........................................................20

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2005)......................................................10

Matthew Sheffield, "Max Baucus, Author of Obamacare, Admits He Never Read His Own Bill," *Washington Examiner*, Aug. 25, 2010 .................13

Richard J. Pierce, Jr., *Reconciling Chevron and Stare Decisis*, 85 Geo. L.J. 2225 (1997) ....................................................24

Samuel A. Donaldson, *The Easy Case Against Tax Simplification*, 22 Va. Tax Rev. 645 (2003) ...............................................19

Thomas W. Merrill, *Justice Stevens and the Chevron Puzzle,* 106 N.W. U. L. Rev. 551 (2012) .......................................24

Vincent L. Frakes, *Partisanship and (Un) Compromise: A Study of the Patient Protection and Affordable Care Act,* 49 Harv. J. on Legis. 135 (2012).............11

x

# **GLOSSARY**

ACA:      Patient Protection and Affordable Care Act, 111 Pub. L. No. 148,
          124 Stat. 119, 111th Cong., 2d Sess., Mar. 23, 2010

## INTEREST OF *AMICI CURIAE*

The Pacific Research Institute ("PRI") is a non-profit non-partisan 501(c)(3) organization that champions freedom, opportunity, and personal responsibility by advancing free-market policy solutions to the issues that impact the daily lives of all Americans. PRI demonstrates how free interaction among consumers, businesses, and voluntary associations is more effective than government action in providing the important results we all seek—good schools, quality health care, a clean environment, and economic growth. Founded in 1979 and based in San Francisco, PRI is supported by private contributions. Its activities include publications, public events media commentary, invited legislative testimony, filing *amicus* briefs with courts, and community outreach.

The Cato Institute ("Cato") was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, files *amicus* briefs with courts, conducts conferences, and publishes the annual *Cato Supreme Court Review*.

1

## **SUMMARY OF THE ARGUMENT**

Despite the multiplicity of filings and the political sensitivity of this litigation, this is a simple case that turns on a fundamental constitutional principle: neither a federal court nor an executive agency is empowered to ignore or override a law's plain meaning—period.  The district court understood that under the express terms of the Affordable Care Act ("ACA") only individuals purchasing insurance through "State" exchanges are eligible for tax subsidies.  Yet the district court rejected this plain reading in favor of the IRS's regulatory interpretation extending subsidies to those purchasing insurance through federal exchanges because it believed that extension best effectuated the ACA's broader purpose of universal coverage. This was a blatant invasion of the powers exclusively vested in Congress under Article I of the Constitution.

By elevating its own perception of Congress's overall purpose in passing the ACA over the law's text, the district court ignored the cardinal principle that legislative purpose must be effected by the words Congress uses, not the words it might have meant or should have chosen to use.  Courts are not empowered under Article III to divine Congress's overarching objective and then reverse-engineer a version of the law that best achieves it.  Quite the opposite, the judicial task is to discern the ordinary meaning of the words Congress used and enforce it.  Thus, even accepting the district court's clearly contestable determination that Congress

would not have wanted to deny tax subsidies to those purchasing insurance through federal exchanges, there was no legitimate basis for deviating from the expressed will of Congress. Unenacted legislative intentions are not Article I supreme law under the Constitution.

Compounding the district court's error, the notion of a unified legislative purpose is almost always a myth. Legislation is a product of negotiation and compromise in which lawmakers may sacrifice one interest to achieve another. In the main, a bill successfully runs the legislative gauntlet not because Congress has a unity of purpose—but because it serves a multiplicity of purposes, some of which may be incompatible. The notion that *every* Representative and Senator voting in favor of a piece of legislation did so for the *same* reason paints an unrealistic picture of the legislative process. The process leading to the ACA's passage illustrates the point. This behemoth of a law—over 2,700 pages in all—resulted from ad hoc procedures, convenient alliances, special deals to secure holdout votes, admissions by key legislators that they never read it, and a chaotic race to the finish line prompted by the surprising outcome of a special election in Massachusetts. If there were ever a case in which a court should refrain from assigning a unified congressional purpose, this is it.

Attempting to uncover a single legislative purpose in derogation of the law's plain meaning is not only beyond the judicial ken, it invades Congress's Article I

province.  If the ACA needs to be amended or rewritten to achieve the legislature's intention in passing it in the first place, that is Congress's job.  That would be true even if the ACA's limitation on subsidies were nothing more than a drafting error. If the statutory provision at issue was the product of inadvertence or oversight, Congress must—and indeed can—fix the problem itself.  Corrective technical legislation, particularly in the complex field of the Internal Revenue Code, is routinely enacted to resolve problems of correlating legislative intent and statutory language.  Pursuit of a technical correction, rather than rewriting the statute to suit the Executive's policy preference, was the proper action for the IRS to take to broaden subsidy entitlement.  Courts are required by Article III to ensure that federal agencies do not end-run the legislative process.

Moreover, resort to limitation on judicial review of administrative rulemaking under *Chevron* cannot justify shirking that duty and departing from the Constitution's requirements.  The purpose of *Chevron* is to preclude the courts from assuming quasi-legislative powers by requiring them to respect the unambiguous language of statutes as well as the implementation discretion properly delegated to administrative agencies by Congress.  Because there was an express designation of subsidy beneficiaries under the ACA and thus no delegation of authority to the IRS, the district court was required to protect Congress's Article

I right to decide for itself which individuals would receive tax subsidies.  Because
it failed to do so, the decision below should be reversed.

## ARGUMENT

## I.   The District Court Improperly Elevated Its Perception Of Congress's Purpose Over the ACA's Plain Meaning.

Appellants have conclusively established that the IRS's regulation allowing
federal exchanges to offer subsidies contradicts the ACA's plain meaning.  *See*
Appellants' Br. 16-26.  This is not even a close question.  Under the ACA, an
eligible taxpayer is entitled to a tax credit "equal to the premium assistance credit
amount of the taxpayer."  26 U.S.C. § 36B(a).  A "premium assistance credit
amount" is defined as the sum of the monthly premium assistance amounts for "all
coverage months of the taxpayer occurring during the taxable year."  *Id.*
§ 36B(b)(1).  A "coverage month" is one in which "the taxpayer . . . is covered by
a qualified health plan . . . enrolled in through an Exchange established by the State
under section 1311 of the [ACA]."  *Id.* § 36B(c)(2)(A)(i).  Therefore, only those
covered "through an Exchange established by the State under section 1311 of the
[ACA]" may receive "premium assistance amounts."

The district court begrudgingly agreed.  As the court explained, "[o]n its
face, the plain language of 26 U.S.C. § 36B(b)-(c) . . . appears to support [this]
interpretation.  Why would Congress have inserted the phrase 'established *by the
State* under [section 1311 of the ACA] if it intended to refer to Exchanges created

5

by a state *or* by HHS?"  Opinion at 26 (Doc. 67) ("Op.") (emphasis in original).

That should have been the end of the matter.  *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous . . . '[the] judicial inquiry is complete.'"  (quoting *Rubin v. United States,* 449 U.S. 424, 430 (1981)); *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) ("We must first 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'  If it does, our inquiry ends and we apply the statute's plain language." (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997) (other citation omitted)).

The district court nevertheless adopted the IRS's expansive construction. It concluded that anomalies would occur if Section 36B were read in accordance with its plain meaning; but that is simply not true.  *See* Appellants' Br. 30-36. Moreover, "[t]ax credits are a matter of legislative grace, are only allowed as clearly provided for by statute, and are narrowly construed."  *United States v. McFerrin*, 570 U.S. 672, 675 (2009) (citing *Helvering v. Nw. Steel Rolling Mills, Inc.*, 311 U.S. 46, 49 (1940) (other citations omitted)); *see also* Appellants' Br. 21, 51-52.  The ACA provides tax credit subsidies in Section 36B only with regard to

State exchanges. Accordingly, neither the district court nor the IRS was authorized by Congress to create such subsidy authorization for federal exchanges by implication or inference.

In truth, the "anomalies" that concerned the district court, and drove its statutory analysis, arose not from a textual conflict between different sections of the statute, but from the perceived variance between the text of the statute and Congress's overall purpose in passing the ACA. According to the district court, "Congress believed that the Act would address the lack of access by many Americans to affordable health care and would lead to 'near-universal coverage.'" Op. 33 (citations omitted); *see also* Op. 33 (concluding that the "central purpose of the ACA" is "to provide affordable health care to virtually all Americans") (citations omitted); Op. 34-35 ("It makes little sense to assume that Congress sacrificed nationwide availability of the tax credit . . . in an attempt to promote state-run Exchanges"); Op. 37 ("Congress assumed that tax credits would be available nationwide.") (citations omitted). Yet even assuming that the district court correctly identified Congress's goal, *but see* Appellants' Br. 37-44, no canon of statutory interpretation authorizes a court to elevate legislative purpose over the plain meaning of the statutory text.

As the Supreme Court has explained, "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in

interpreting a statute a court should always turn first to one, cardinal canon before all others." *Germain*, 503 U.S. at 253. That "preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRocs Ltd., LLC*, 541 U.S. at 183 (quoting *Germain*, 503 U.S. at 253-54). Courts "do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* 510 U.S. 135, 147-48 (1994); *see also Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language." (citation and quotations omitted)). Accordingly, even if the ACA's text is at cross-purposes with Congress's objective of universal coverage, as the district court and the IRS believe, that supposed conflict is irrelevant. "In such a contest, the text must prevail." *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 259 n.6 (2009).

Favoring the ACA's text over a contrary legislative purpose is not an arbitrary judicial policy—it follows from first principles. Courts apply laws not intentions because laws are the only thing that command legitimacy. "The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself." *Aldridge v. Williams*, 44 U.S. 9, 24 (1845); *see also P.R. Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 501 (1988) ("[U]nenacted approvals, beliefs, and desires are not laws."); *Republic of*

8

*Argentina v. Wetlover, Inc.*, 504 U.S. 607, 618 (1992) ("The question . . . is not what Congress 'would have wanted' but what Congress enacted."). In other words, "the law *is* what the law *says*." *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 279 (1996) (Scalia, J., concurring) (emphasis in original). Thus, even if ACA's purpose were discernible through the foggy lens of legislative history, courts may not vindicate it at the expense of the words chosen by Congress. "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998); *see, e.g.*, *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2044 (2012) ("Vague notions of statutory purpose provide no warrant for expanding § 2607(b)'s prohibition beyond the field to which it is unambiguously limited[.]").

The reality, of course, is that the search for a unified legislative intent will almost always end in disappointment. "Every legisla*tor* has an intent, which usually cannot be discovered, since most say nothing before voting on most bills; and the legisla*ture* is a collective body that does not have a mind; it 'intends' only that the text be adopted, and statutory texts usually are compromises that match no one's first preference." Frank H. Easterbrook, foreword to *Reading Law: The Interpretation of Legal Texts*, by Antonin Scalia & Bryan A. Garner (1st ed. 2012) (emphasis in original). More often than not, individual legislators have sharply

9

different views on the goals and scope of their enactments, so "the words by which the legislature undertook to give expression to its wishes" offer the most "persuasive evidence" of a statute's purpose.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982).

It should come as no surprise that a final product may lack an internally consistent purpose as legislation often is passed through compromise and negotiation among competing interests.  "[L]egislative preferences do not pass unfiltered into legislation; they are distilled through a carefully designed process that requires legislation to clear several distinct institutions, numerous veto gates, the threat of a Senate filibuster, and countless other procedural devices."  John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2390 (2003).  Results that might seem ill-fitting as an abstract policy matter "may be perfectly rational from a legislative process perspective."  *Id.* at 2431.  For "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice."  *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646-47 (1990) (citation omitted).

Attempting to divine a singular legislative purpose from this type of process is therefore hazardous even as a last resort.  *See Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement

10

of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.").  But to use the results of this kind of vague judicial inquiry into legislative motive as the interpretative touchstone when the text of the statute is unambiguous, as is the case here, is constitutionally intolerable.

Indeed, the legislative history of the ACA is a case study in why the search for a unified legislative intent is treacherous.  To state the obvious, the ACA was hardly the result of a deliberative, rational process in which the Congress acted with clarity of purpose.  "The debate over health care was contentious from the legislation's inception, and enacting it required a variety of ad hoc procedures." John Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 Law Libr. J. 131, 133 (2013). "[F]ragile truce[s]" and "delaying tactic[s]" plagued the process as the ACA's proponents scrambled to insulate themselves from filibuster.  *Id.* at 156.  For example, one key Senator's vote was secured by adding an amendment to boost his state's Medicaid reimbursement rates, and another's was reportedly obtained in exchange for similar inducements.  *See* Vincent L. Frakes, *Partisanship and (Un)Compromise: A Study of the Patient Protection and Affordable Care Act*, 49 Harv. J. on Legis. 135, 138-39 (2012).

11

Amendments reflected more unusual bargains as well. "Opposition to funding the proposal through taxes on elective cosmetic surgery," for instance, "led to a change that taxed 'indoor tanning services' instead." Cannan, *supra*, at 156-57. And after Senator Scott Brown replaced Senator Ted Kennedy, the bill stood on a knife's edge, as the filibuster-proof majority in the Senate unexpectedly collapsed. The bill survived only because a slim House majority passed it *in toto*—and separately pushed through amendments by way of a short-fuse "reconciliation" bill that was immune from filibuster. H.R. Res. 1225, 111th Cong. (Mar. 25, 2010). More than any other law in recent history, "[a] change in any individual provision [in the ACA] could have unraveled the whole." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002). The end result was a 2,700-page reformation of the American health care system. That few, if any, legislators actually read the bill is obvious from its length. Key House and Senate members admitted as much. Speaker Nancy Pelosi explained: "We have to pass the bill so that you can find out what is in it—away from the fog of the controversy."[2] Senate

---

[2]     Democratic Leader Nancy Pelosi, News Room: Speeches, http://www.democraticleader.gov/news/press/pelosi-remarks-2010-legislative-conference-national-association-counties (last visited Feb. 5, 2014).

Finance Committee Chairman Max Baucus similarly added: "I don't think you want me to waste my time to read every page of the healthcare bill."[3]

Given this "rough and tumble of the legislative process," *Robbins v. Chronister*, 435 F.3d 1238, 1243 (10th Cir. 2006), it would be folly to rely on legislative intent as an interpretative anchor. *See Barnhart*, 534 U.S. at 461 (refusing to "judge or second-guess" the legislative process). Legislative intent is, on its best day, a secondary tool of statutory construction that courts will sometimes employ when the primary interpretative means fail to yield a clear answer. But that is not the situation presented here. The ACA's text is unmistakably clear. It just fails to embody the district court's perception of what Congress was trying to achieve in this legislation. That kind of reverse-engineered interpretative process is wholly inappropriate, especially given the ACA's chaotic path to law. In a case like this, the statute's text is the only sure footing. It must be enforced as written.

## II.     Article III Of The Constitution Does Not Empower This Court To Rewrite The ACA To Ensure That It Fulfills Congressional Objectives Not Set Forth In The Statutory Text.

"[H]ew[ing] to the statutory text" is more than just a sound policy—the Constitution's separation of powers commands it. *Engine Mfrs. Ass'n v. EPA*, 88

---

[3]     Matthew Sheffield, "Max Baucus, Author of Obamacare, Admits He Never Read His Own Bill," *San Francisco Examiner*, Aug. 24, 2010.

F.3d 1075, 1092 (D.C. Cir. 1996).  The judiciary's duty to apply the plain language follows directly from its "limited role in [the] tripartite government." *Robbins*, 435 F.3d at 1243.  "While '[i]t is emphatically the province and duty of the judicial department to say what the law is,' it is equally—and emphatically—the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) (citation omitted).  Because the federal courts have "neither Force nor Will, but merely judgment," The Federalist No. 78, 523 (A. Hamilton) (Jacob E. Cooke ed., 1961), they "cannot amend or modify any legislative acts" or judge "questions as expedient or inexpedient, as politic or impolitic," *License Tax Cases*, 72 U.S. 462, 469 (1866). Congress and the President—not the courts—are accountable to the voters, and they alone are entrusted with "the final say on policy issues." *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 234 (1956).

In turn, the judiciary is structurally bound to respect the compromises wrought during the legislative process, and it must resist the urge to rewrite a more purposeful, internally consistent statute.  When courts rewrite statutes to better effectuate Congress's overall purpose, they "become effective lawmakers, bypassing the give-and-take of the legislative process." *City of Joliet, Ill. v. New West, L.P.*, 562 F.3d 830, 837 (7th Cir. 2009).  It is not the judiciary's job to

achieve "a more coherent, more rational statute." *Robbins*, 435 F.3d at 1243. To the contrary, by glossing over hidden legislative compromises, judicial adjustments invade the heartland of Article I. *See, e.g.*, *Bate Refrigerating Co. v. Sulzberger*, 157 U.S. 1, 43 (1895) ("We have no authority to add to the clause last quoted the words, 'prior to his application.' To do so would be to legislate, and not to interpret and give effect to the statute as passed by congress.").

Perhaps the district court was correct in its assessment that Congress's goal was or should have been to broaden access to insurance nationwide and that Appellants' reliance on the statutory language would undermine that objective. But it is quite clear that Congress did not incorporate that preference into Section 36B. "What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 250-51 (1926). At base, "these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'" *Burrage v. United States*, --- S. Ct. ---, 2014 WL 273243, at *8 (Jan. 27, 2014) (quoting *Commissioner v. Lundy*, 516 U.S. 235, 252 (1996) (other citation and quotation marks omitted)).

In fact, the statutory text could be a pure drafting error—producing a law precisely the *opposite* of what Congress intended—and the Court *still* must enforce it as written. This Court cannot "soften the import of Congress's chosen words even if [it] believe[s] the words lead to a harsh outcome." *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004). Instead, "if Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. It is beyond [this Court's] province to rescue Congress from its drafting errors, and to provide for what [it] might think is the preferred result." *Id.* at 542 (citations and alterations omitted); *see also United States v. Locke*, 471 U.S. 84, 95 (1985) ("The fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do."); *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991) ("The facile attribution of congressional 'forgetfulness' cannot justify [judicial] usurpation.").

If it was an error in the ACA's drafting that excluded individuals purchasing insurance through federal exchanges from eligibility for tax credits and, "that effect was unintended, it is a problem for Congress, not one that federal courts can fix." *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 217 (2010). "Judicial nullification of statutes . . . has, happily, no place in our system. The Congress by

16

legislation can always, if it desires, alter the effect of judicial construction of statutes." *Sorrells v. United States*, 287 U.S. 435, 450 (1932).

Congress has a long history of doing just that.  In one of its first decisions, the Supreme Court read Article III's grant of federal jurisdiction to cases "between a State and Citizens of another State" as exposing states to federal-court suits by citizens of other states.  *Chisholm v. Georgia*, 2 U.S. 419, 420 (1793).  "Each of the four Justices who concurred in the judgment issued a separate opinion.  The common theme of the opinions was that the case fell within the literal text of Article III, which by its terms granted the federal courts jurisdiction over controversies 'between a State and Citizens of another State,' and 'between a State, or the Citizens thereof, and foreign States, Citizens, or Subjects.'"  *Alden v. Maine*, 527 U.S. 706, 719 (1999).  In enforcing Article III as drafted, the Court rejected the views of Justice Iredell, who "contended that it was not the intention to create new and unheard of remedies by subjecting sovereign States to actions at the suit of individuals, which he conclusively showed was never done before."  *Hans v. Louisiana*, 134 U.S. 1, 12 (1890) (citing *Chisholm*, 2 U.S. at 434-50).

The Court's ruling "fell upon the country with a profound shock."  *Alden*, 527 U.S. at 720.  Indeed, Georgia promptly enacted "a bill providing that anyone attempting to enforce the . . . decision would be 'guilty of felony and shall suffer death, without benefit of clergy, by being hanged.'"  *Id.* at 720-21 (citation

17

omitted). Congress responded to the Supreme Court's ruling by promptly passing a constitutional amendment reaffirming the states' sovereign immunity from suit in federal courts and plugging the hole in Article III. *See Hans*, 134 U.S. at 11 ("[A]t the first meeting of congress thereafter, the eleventh amendment to the constitution was almost unanimously proposed."). Each branch thus fulfilled its role. The Supreme Court faithfully interpreted the Constitution's text. And Congress amended it to solve the problem.

As another example, in the 1940s the Supreme Court broadly interpreted the undefined terms "work" and "workweek" in the Fair Labor Standards Act. The Court concluded that these terms "encompassed time spent 'pursu[ing] certain preliminary activities after arriving . . . , such as putting on aprons and overalls [and] removing shirts.'" *See Sandifer v. U.S. Steel Corp.*, --- S. Ct. ---, 2014 WL 273241, at *4 (Jan. 27, 2014) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692-93 (1946)). Again, Congress responded through legislation to ensure that the law continued to operate consistent with the legislature's purpose; the Portal-to-Portal Act of 1947 expressly rectified the Court's "disregard of long-established customs, practices, and contracts between employers and employees." *Id.* (quoting 61 Stat. 84 (1947), as amended, 29 U.S.C. § 251(a)).

Most recently, in 2009, the Lilly Ledbetter Fair Pay Act was enacted to supersede a judicial interpretation of the charging period set forth in Title VII.

18

Noting "the legislative compromises that preceded the enactment of Title VII," the Supreme Court had strictly held that Title VII's charging period was triggered on the date an employer made its initial discriminatory wage decision, not on the date of the most recent paycheck issued. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 630-31 (2007). Congress viewed this interpretation as "at odds with the robust application of the civil rights laws that Congress intended," Pub. L. No. 111-2, § 2, 123 Stat. 5 (2009), and promptly amended Title VII to ensure that the limitations period for equal-pay claims renews with each paycheck affected by discriminatory action, *id*. § 3.

This case is no different. Nothing prevents Congress from amending the ACA to provide for tax credits in both state and federal exchanges if that is what it intended in the first place. As always, Congress is free to "turn[] to technical corrections" when "it wishes to clarify existing law." *Exxon Mobil Corp. & Affiliated Cos. v. C.I.R.*, 136 T.C. 99, 119 (Tax Ct. 2011). Indeed, Congress "must routinely correct for technical errors and sometimes amend new provisions after enactment to harmonize old and new laws." Samuel A. Donaldson, *The Easy Case Against Tax Simplification*, 22 Va. Tax Rev. 645, 670 (2003); *see, e.g*., Tax Technical Corrections Act of 2007, Pub. L. No. 110-172, 121 Stat. 2473 (2007); Tax Technical Corrections Act of 2005, Pub. L. No. 109-135, 119 Stat. 2610 (2005); Tax Technical Corrections Act of 1998, Pub. L. No. 105-206, 112 Stat. 790

19

(1998); Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, 102 Stat. 3342 (1988); Technical Corrections Act of 1982, Pub. L. No. 97-448, 96 Stat. 2365 (1983).

If Congress wants to correct any errors it can do so immediately. "Existing procedures such as suspension of the rules or proceeding under unanimous consent" give Congress the tools to fix legislation "on an expedited schedule." John C. Nagle, *Corrections Day*, 43 UCLA L. Rev. 1267, 1281 (1996). "It should not be hard to secure legislative correction of [an] alleged judicial error if the courts have in fact misread the Congressional purpose and the consequences to the revenue are as serious as the government says." *Paddock v. United States*, 280 F.2d 563, 568 (2d Cir. 1960) (Friendly, J.).

That the ACA is deeply controversial does not alter the analysis. In 1992, for example, Congress passed the Coal Industry Retiree Health Benefit Act, but only after enduring "a maelstrom of contract negotiations, litigation, strike threats, a Presidential veto of the first version of the bill and threats of a second veto, and high pressure lobbying, not to mention wide disagreements among Members of Congress." *Barnhart*, 534 U.S. at 445-46. By the end, the statute was "quite absurd—made no sense." Scalia & Manning, *supra*, at 1615. As enacted by Congress, if certain coal companies sold their mining business to a third party, the purchaser had no liability to pay taxes for underfunded coal-miner pensions. *Id.* at

20

1614.  "But if one of the original coal companies also owned an affiliated business (say, a bakery) and sold those assets to a third party, that third party would inherit the tax obligation for the miners' pensions."  *Id.*; *see also Barnhart*, 534 U.S. at 465 (Stevens, J., dissenting).

Yet despite this incongruity, the Supreme Court "interpret[ed] the language of the statute enacted by Congress" and enforced the statute as written.  *Barnhart*, 534 U.S. at 461.  In light of the Coal Act's contentious origins, the Court reasoned, abandoning the plain text in search of a more sensible construction could well produce a law that "would not have survived the legislative process" if advanced in Congress.  *Id.*  That the legislation was controversial was a prime reason to adhere *more closely* to the text, not less.  "These are battles that should be fought among the political branches and [private stakeholders]," not through appeal to the courts. *Id.* at 462.

Nor do the political odds on such a correction bear on the proper result here. "The Framers of the Constitution could not command statesmanship," and "[f]ailure of political will does not justify unconstitutional remedies."  *Clinton v. City of New York*, 524 U.S. 417, 449, 452-53 (1998) (Kennedy, J., concurring). "The Constitution's structure requires a stability which transcends the convenience of the moment."  *Id.* at 449.  Regardless of legislative inaction, the courts "are not

at liberty to rewrite [laws] to reflect a meaning [they] deem more desirable." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008).

### III. The IRS Has No More Authority Than This Court To Usurp Congress's Lawmaking Authority To Ensure That Tax Credits Are Available For Those Purchasing Insurance Through Federal Exchanges.

Interpreting Congress's enactments faithfully is equally important in reviewing an agency's attempt to rewrite the statute. "Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *see also City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1882 (2013) ("*Chevron* deference . . . rests on a recognition that Congress has delegated to an agency the interpretive authority to implement a particular provision or answer a particular question.") (citations and quotations omitted). The agency's reasonable construction is entitled to judicial respect because, by leaving a gap in the statute, Congress has implicitly chosen to delegate *its* "lawmaking power" to the federal agency. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980). Respect for the agency's construction of the statute vindicates Congress's choice.

By the same token, however, "if the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Chevron, U.S. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). That is because "[w]hen the statute is unambiguous, there has been no delegation to the agency to interpret the statute and therefore the agency's interpretation deserves no consideration at all, much less deference." *Terrell v. United States*, 564 F.3d 442, 450 (6th Cir. 2009); *see, e.g., Sundance Assocs., Inc. v. Reno*, 139 F.3d 804, 809-10 (10th Cir. 1998) ("Although [the law] was poorly drafted and should never be used as a model of the English language, its intent is clear to this court. . . .  Of course, this court is sympathetic to the purported goals of this legislation—preventing the sexual exploitation of children. . . .  [But] neither the court nor the Attorney General has the authority to rewrite a poor piece of legislation . . . .  That responsibility lies solely with Congress.").  Unlike when there is a statutory gap, signaling a congressional delegation, upholding a regulation that varies from the law's unambiguous terms usurps Congress's choice *not* to delegate its lawmaking power to the agency.

To allow the IRS to ignore the ACA's plain meaning, as the district court would here, *see* Op. 38 n.14, thus deals a double blow to our tripartite system. First, it allows the Executive to ignore the will of Congress—expressed in the text—and substitute his preferred policy for the one provided for by law.  The Constitution does not give the executive branch "the unilateral power to change the text of duly enacted statutes." *Clinton*, 524 U.S. at 447; *see also Landstar Express*

*America, Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) ("[N]either courts nor federal agencies can rewrite a statute's plain text to correspond to its supposed purposes."). As this Court has explained, "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty*, 725 F.3d 255, 260 (D.C. Cir. 2013). The IRS may disagree with Congress's choice to deny tax subsidies to those purchasing insurance through federal exchanges. But it is Congress's choice to make. "When Congress gives an agency its marching orders, the agency must obey all of them, not merely some." *Pub. Citizen v. NRC*, 901 F.2d 147, 156 (D.C. Cir. 1990).

Second, it allows the judiciary to hide behind the pretense of agency deference to impose its own sense of what is best and thus arrogate power that the Constitution assigned to Congress. That is the very problem that *Chevron* was designed to solve. "Before *Chevron*, each of hundreds of federal judges had substantial policymaking power." Richard J. Pierce, Jr., *Reconciling Chevron and Stare Decisis*, 85 Geo. L.J. 2225, 2233 (1997). *Chevron* ensures that policymaking resides in the political branches and that the power either to make the legislative choice itself or delegate that responsibility to an agency remains "under the control of Congress." Thomas W. Merrill, *Justice Stevens and the Chevron Puzzle*, 106 NW. U. L. Rev. 551, 555-56 (2012). When there has been a delegation, *Chevron*

24

thus keeps judges "from substituting their own interstitial lawmaking for that of an agency." *City of Arlington, Tex.*, 133 S. Ct. at 1873 (citations and quotations omitted). And when there has not been a delegation, the reviewing court's only "task is to enforce the unambiguously expressed intent of Congress." *American Land Title Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 892 F.2d 1059, 1062 (D.C. Cir. 1989).

The district court did not uphold its end of the bargain. Even assuming that *Chevron* applies here, *but see* Appellants' Br. 46-49, the IRS was not filling a gap in the statutory regime. Congress unambiguously limited subsidies to those purchasing through State exchanges. *See id.* 45-46. The district court allowed the IRS to rewrite the law because it agreed with the agency's assessment that Congress could not have meant to deny subsidies to those purchasing insurance through federal exchanges. But the Constitution allocated to Congress the right to decide that question for itself through the express terms of the ACA and thus does not afford the IRS discretion to authorize the expenditure of billions of taxpayer dollars. Under a proper application of *Chevron*, the district court was required to see to it that Congress's choice was respected. It failed to do so.

*     *     *

As noted above, this is not a particularly close case. But it does require the Court to draw a hard line. Even if Congress had intended to make subsidies

broadly available, it failed to incorporate that preference into the ACA. Neither this Court nor the IRS is empowered by the Constitution to rewrite the statute to correct the perceived legislative oversight. While to do so might be expedient in the short term, it would cause long-term institutional damage. After all, we are "a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). Those laws must be written by Congress.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

By:  s/ Bert W. Rein

C. Dean McGrath, Jr.
MCGRATH & ASSOCIATES
1025 Thomas Jefferson St., N.W.
Suite 110G
Washington, DC  20007
Tel: (202) 295-2304

Ilya Shapiro
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20036
Tel: (202) 842-0200

Bert W. Rein*
William S. Consovoy
J. Michael Connolly
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
Email: brein@wileyrein.com

*Counsel of Record

Dated: February 6, 2014

*Counsel for Amici Curiae*

26

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) because it contains 6,120 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

　　　　　　　　　　　　  s/ Bert W. Rein_____

Bert W. Rein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
Email: brein@wileyrein.com

*Counsel for Amici Curiae*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of February, 2014, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

s/ Bert W. Rein

Bert W. Rein
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
Email: brein@wileyrein.com

*Counsel for Amici Curiae*
