[EN BANC ORAL ARGUMENT SCHEDULED FOR DECEMBER 17, 2014]

No. 14-5018

================================================================

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

JACQUELINE HALBIG, et al.,

Plaintiffs-Appellants,

v.

SYLVIA MATHEWS BURWELL,
Secretary of Health and Human Services, et al.,

Defendants-Appellees.

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (No. 1:13-cv-00623-PLF) (Hon. Paul L. Friedman)

—————————————

**BRIEF OF THE COMMONWEALTH OF VIRGINIA
AND THE STATES OF ARKANSAS, CALIFORNIA, DELAWARE,
HAWAII, ILLINOIS, IOWA, MAINE, MARYLAND, MISSISSIPPI, NEW
HAMPSHIRE, NEW MEXICO, NEW YORK, NORTH CAROLINA,
OREGON, PENNSYLVANIA, VERMONT AND WASHINGTON AS *AMICI
CURIAE* IN SUPPORT OF AFFIRMANCE**

—————————————

MARK R. HERRING
 *Attorney General of Virginia*

TREVOR S. COX
 *Deputy Solicitor General*

STUART A. RAPHAEL*
 *Solicitor General of Virginia*
 *Counsel of Record

Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-7240

 *Counsel for Amici Curiae*

November 3, 2014

[Additional Counsel Listed Inside Cover]

DUSTIN McDANIEL
Attorney General of Arkansas
323 Center Street, Suite 200
Little Rock, AR 72201

KAMALA D. HARRIS
Attorney General of California
1300 I Street, Suite 125
Sacramento, CA 94244

JOSEPH R. BIDEN III
Attorney General of Delaware
820 N. French Street
Wilmington, DE 19801

DAVID M. LOUIE
Attorney General of Hawaii
425 Queen Street
Honolulu, HI 96813

LISA MADIGAN
Attorney General of Illinois
100 West Randolph Street, 12th Floor
Chicago, IL 60601

TOM MILLER
Attorney General of Iowa
1305 E. Walnut Street
Des Moines, IA 50319

JANET T. MILLS
Attorney General of Maine
6 State House Station
Augusta, ME 04333

DOUGLAS F. GANSLER
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202

JIM HOOD
Attorney General of Mississippi
550 High Street, Suite 1200
Jackson, MS 39201

JOSEPH A. FOSTER
Attorney General of New Hampshire
33 Capitol Street
Concord, NH 03301

GARY K. KING
Attorney General of New Mexico
P. O. Drawer 1508
Santa Fe, NM 87504

ERIC T. SCHNEIDERMAN
Attorney General of New York
120 Broadway, 25th Floor
New York, NY 10271

ROY COOPER
Attorney General of North Carolina
9001 Mail Service Center
Raleigh, NC 27699

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street, N.E.
Salem, OR 97301

KATHLEEN G. KANE
Attorney General of Pennsylvania
16th Floor, Strawberry Square
Harrisburg, PA 17120

WILLIAM H. SORRELL
Attorney General of Vermont
109 State Street
Montpelier, VT 05609

BOB FERGUSON
Attorney General of Washington
1125 Washington Street SE
Olympia, WA 98504

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28, amici certify as follows:

A.    <u>Parties and Amici</u>.

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants, the Brief for Appellees, and in the opinion of the panel, 758 F. 3d 390 (D.C. Cir. 2014).  As of this filing, the following amici have appeared in this Court at the en banc stage:

Judicial Watch, Inc.

Jonathan H. Adler

Michael F. Cannon

Pacific Research Institute

Cato Institute State of Kansas

State of Nebraska

Representative Dave Camp

Senator John Cornyn

Senator Ted Cruz

Senator Orrin Hatch

Representative Darrell Issa

Senator Mike Lee

Senator Marco Rubio

Galen Institute

American Association of Retired Persons (AARP)

American Cancer Society

Cancer Action Network

American Diabetes Association

American Heart Association

Harvard Law School Center for Health Law and Policy Innovation

Economic Scholars (Linda Blumberg, David Cutler, Jonathan Gruber, Marilyn Moon, Harold Pollack, and Henry Aaron)

National Health Law Program

Southern Poverty Law Center

i

AARP Foundation Litigation

Certain Individuals with Preexisting Conditions (Jared Blitz, Jennifer Causor, Steve Orofino, Aidan Robinson, Martha Robinson, David Tedrow, and Mary Tedrow)

AIDS Alabama

AIDS Institute

Association for Community Affiliated Plans ("ACAP")

Community Catalyst

Duke AIDS Legal Project

HIV Medicine Association ("HIVMA")

National Alliance of State and Territorial AIDS Directors ("NASTAD")

National Minority AIDS Council ("NMAC")

North Carolina AIDS Action Network

One Voice Texas

Southern HIV/AIDS Strategy Initiative ("SASI")

Craig H. Blakely, PhD, MPH

Paul Brandt-Rauf, DrPH, MD, ScD,

Paul D. Cleary, Ph.D.

José F. Cordero, MD, MPH

Gregory Evans, Ph.D., M.P.H.

John R. Finnegan, Jr., PhD.

Lynn R. Goldman, M.D., M.S., M.P.H.

Richard S. Kurz, PhD

Robert F. Meenan, MD, MPH, MBA

Philip C. Nasca, MS, Ph.D., FACE

Michael G. Perri, PhD, ABPP

Martin A. Philbert, PhD

George G. Rhoads, MD, MPH

Edwin Trevathan, M.D., M.P.H.

Robert W. Blum, MD

Kyle L. Grazier, Dr.P.H., M.P.H.

Paula Lantz, Ph.D.

Laura Rudkin, Ph.D.

Oladele A. Ogunseitan, PhD, MPH

José Szapocznik, Ph.D.

Taylor L. Burke, J.D., L.L.M.

John A. Graves, Ph.D.

Peter Jacobson, JD, MPH

Leighton Ku, Ph.D., M.P.H

Jeffrey Levi, Ph.D.

Jay Maddock, Ph.D.

Wendy K. Mariner                          Joel Teitelbaum, J.D., LL.M.

Michelle M. Mello, J.D., Ph.D.            Jane Hyatt Thorpe, J.D.

Sara Rosenbaum, J.D.                      Susan F. Wood, Ph.D.

Benjamin Sommers, M.D., Ph.D.

Katherine Swartz, PhD

      B.    <u>Rulings Under Review</u>.

References to the rulings at issue appear in the Brief for Appellants.

      C.    <u>Related Cases</u>.

This case was previously before a panel of the Court. *Halbig v. Burwell*,

758 F.3d 390 (D.C. Cir. 2014). The en banc Court vacated the judgment and

granted rehearing en banc. *Halbig v. Burwell*, No. 14-5018, Document No.

1510560 (D.C. Cir. Sept. 4, 2014). We are unaware of any related cases within the

meaning of Circuit Rule 28.


                            /s/

                            Stuart A. Raphael
                            Solicitor General of Virginia

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF CONTENTS ......................................................................... iii

TABLE OF AUTHORITIES ................................................................... v

GLOSSARY ......................................................................................... xi

INTEREST OF AMICI CURIAE ............................................................ 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT ........................................................................................ 3

I.    In the thirty-four States with federally-facilitated Exchanges, millions of citizens depend on premium-assistance tax credits to afford the health insurance that the ACA requires them to purchase. ............................. 3

II.   Under Appellants' implausible interpretation, the ACA would effectively coerce States into building Exchanges by burdening their citizens and damaging their insurance markets if they chose otherwise. ........ 9

III.  Appellants' interpretation of the ACA is implausible under the *Pennhurst* doctrine because Congress did not give States clear notice that electing to forgo a State-based exchange would deprive State citizens of federal subsidies and wreck State insurance markets. ................. 11

      A.   The *Pennhurst* doctrine requires that Congress give States clear notice of conditions imposed under Spending Clause statutes. .......... 11

      B.   The Amici States had no clear notice that relying on a federally-facilitated Exchange would harm their citizens and disrupt their insurance markets. ............................................................... 14

      C.   Nothing in the text, structure, purpose or history of the ACA clearly indicated that States would be deprived of federal

premium assistance if they chose to rely on federally-facilitated
Exchanges .......................................................................................19

IV. The doctrine of constitutional avoidance requires rejecting
Appellants' interpretation of the ACA because their reading raises
serious constitutional questions under the Tenth Amendment .....................30

CONCLUSION ......................................................................................32

CERTIFICATE OF COMPLIANCE .......................................................33

CERTIFICATE OF SERVICE ...............................................................34

# TABLE OF AUTHORITIES

Page

## CASES

*Abramski v. United States*,
    134 S. Ct. 2259 (2014) ................................................................21

*\*Am. Train Dispatchers Ass'n v. ICC*,
    54 F.3d 842 (D.C. Cir. 1995) ......................................................21

*\*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ........................................................... 12, 18

*Barbour v. Wash. Metro. Area Transit Auth.*,
    374 F.3d 1161 (D.C. Cir. 2004) ............................................ 13, 19

*Chemical Mfrs. Ass'n v. EPA*,
    217 F.3d 861 (D.C. Cir. 2000) ....................................................20

*Chisom v. Roemer*,
    501 U.S. 380 (1991) ....................................................................28

*Cnty. of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) ..................................................18

*Doe by Fein v. District of Columbia*,
    93 F.3d 861 (D.C. Cir. 1996) ......................................................13

*Edwards v. District of Columbia*,
    821 F.2d 651 (D.C. Cir. 1987) ....................................................13

*Halbig v. Burwell*,
    758 F.3d 390 (D.C. Cir. 2014) ..................................................... ii

*King v. Sebelius*, 997 F. Supp. 2d 415 (E.D. Va. 2014),
    *aff'd sub nom. King v. Burwell*, 759 F.3d 358 (4th Cir. 2014),
    *cert. pending*, No. 14-114 (U.S. filed July 31, 2014) .........................30

*Lampkin v. District of Columbia*,
    27 F.3d 605 (D.C. Cir. 1994) ................................................. 13, 20

\* Authorities chiefly relied upon.

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)................................................................24

*Maracich v. Spears*,
    133 S. Ct. 2191 (2013)..........................................................21

*McCarthy v. Bronson,*
    500 U.S. 136 (1991)..............................................................21

*\*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    132 S. Ct. 2566 (2012).......................... 3, 10, 11, 13, 19, 20, 24, 30, 31

*\*New York v. United States*,
    505 U.S. 144 (1992)..............................................................31

*\*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)................................................ 2, 11, 12, 13, 29

*\*Printz v. United States*,
    521 U.S. 898 (1996)..............................................................31

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010)..............................................................29

*United States v. Heirs of Boisdore*,
    49 U.S. 113 (1849)................................................................20

*United States Nat'l Bank v. Indep. Ins. Agents of Am.*,
    508 U.S. 439 (1993)..............................................................20

*Util. Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014)..........................................................25

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend X................................................................ 31, 33

U.S. Const. art. I, § 8..............................................................11

## STATUTES

124 Stat. 120 (Title I, Subtitle D, part 3) ...............................................14

124 Stat. 130 ...............................................................................25

124 Stat. 213 ...............................................................................25

26 U.S.C. § 36B ................................................................ 4, 19, 22, 25

26 U.S.C. § 36B(a) ...........................................................................4

26 U.S.C. § 36B(b)(2)(A) ...............................................................19

26 U.S.C. § 36B(c)(1)(A) .................................................................4

26 U.S.C. § 5000A(a) .......................................................................3

26 U.S.C. § 5000A(e)(1)(A) .............................................................8

42 U.S.C. § 300gg-91(d)(21) ..........................................................22

42 U.S.C. § 1437p ...........................................................................14

42 U.S.C. § 2000d-7(a)(1) ..............................................................20

42 U.S.C. § 11432(d) ......................................................................20

42 U.S.C. § 18031 .................................................................... 21, 24

42 U.S.C. § 18031(a) ...................................................................4, 21

42 U.S.C. § 18031(b)(1) ..............................................................4, 21

42 U.S.C. § 18031(d) ......................................................................22

42 U.S.C. § 18031(d)(1) ..................................................................22

42 U.S.C. § 18032 ...........................................................................23

42 U.S.C. § 18032(f)(1)(A) .............................................................23

42 U.S.C. § 18041(c) ................................................................ 14, 21

42 U.S.C. § 18041(c)(1) ........................................................ 4, 22, 23

42 U.S.C. § 18071(c) .........................................................................4

42 U.S.C. § 18082(a) .........................................................................5

42 U.S.C. § 18082(c)(2)(A) ..............................................................5

42 U.S.C. § 18082(c)(2)(B) ..............................................................5

42 U.S.C. § 18082(c)(3) ....................................................................5

N.H. Rev. Stat. Ann. § 420-N:7 (LexisNexis 2014) .......................15

N.H. Rev. Stat. Ann. § 420-N:10, I(h)(1) (LexisNexis 2014) .................15

## RULES

D.C. Circuit Rule 28 ............................................................ i, ii

D.C. Circuit Rule 29 ............................................................1

Fed. R. App. P. 29(a) ..........................................................1

## REGULATIONS

77 Fed. Reg. 30,377 (May 23, 2012)
  (codified at 26 C.F.R. § 1.36B-1(k)).............................. xi, 18

## CONGRESSIONAL MATERIALS

155 Cong. Rec. S11,964 (Nov. 21, 2009)................................26

155 Cong. Rec. S12,358 (Dec. 4, 2009) .................................26

155 Cong. Rec. S12,779 (Dec. 9, 2009) .................................26

155 Cong. Rec. S13,375 (Dec. 17, 2009) ...............................26

155 Cong. Rec. S13,559 (Dec. 20, 2009) ...............................26

Verbatim Transcript, *Markup of the Reconciliation Act of 2010,*
  *H. Comm. on Budget*, 111th Cong., 2010 WL 941012 (Mar. 15,
  2010)........................................................................27

## OTHER AUTHORITIES

A. Doyle,
  *Silver Blaze*, *The Complete Sherlock Holmes* (1927) .........................28

Amicus Mem. of Commonwealth of Virginia in Supp. of Pls.' Mot.
  for Summ. J.,
  *Halbig v. Sebelius*, No. 1:13-cv-00623 (D.D.C. Nov. 19, 2013)
  (ECF No. 60).................................................................28

Christine Eibner & Evan Saltzman, Rand Corp., *Assessing*
  *Alternative Modifications to the Affordable Care Act—Impact on*
  *Individual Market Premiums and Insurance Coverage* (Oct.
  2014),
  http://www.rand.org/pubs/research_reports/RR708.html....................10

Gov. Heineman on Federal Health Care Law:
  $646 Million State Exchange Too Costly—State of Nebraska to

Participate in Federal Health Exchange (Nov. 15, 2012),
http://www.governor.nebraska.gov/news/2012/11/15_health_care.
html.................................................................................................................17

Jonathan Cohn,
*Jonathan Gruber: 'It Was Just a Mistake,' An Obamacare
architect explains a 2012 quote that's fueling critics*, New
Republic (July 25, 2014),
http://www.newrepublic.com/article/118851/jonathan-gruber-
halbig-says-quote-exchanges-was-mistake..........................................................29

Jonathan H. Adler & Michael F. Cannon,
*Taxation Without Representation: The Illegal IRS Rule To Expand
Tax Credits Under the PPACA*, 23 Health Matrix 119 (2013)...........................27

Kaiser Family Found., *Subsidy Calculator* (2014),
http://kff.org/interactive/subsidy-calculator/ ........................................................5

Larry Levitt & Gary Claxton,
Kaiser Family Found, *The Potential Side Effects of Halbig* (July
31, 2014),
http://kff.org/health-reform/perspective/the-potential-side-effects-
of-halbig/ ....................................................................................................8, 10

Letter from Governor Jack A. Markell to Secretary Kathleen
Sebelius (Nov. 14, 2012),
https://www.cms.gov/CCIIO/Resources/Technical-
Implementation-Letters/Downloads/de-exchange-letter.pdf..............................16

Letter from Governor Mike Beebe to Secretary Kathleen G. Sebelius
(Dec. 12, 2012),
https://www.cms.gov/CCIIO/Resources/Technical-
Implementation-Letters/Downloads/ar-exchange-letter.pdf...............................15

Letter from Governor Pat Quinn to Gary Cohen,
Centers for Medicare & Medicaid Services (Oct. 16, 2012),
https://www.cms.gov/CCIIO/Resources/Technical-
Implementation-Letters/Downloads/il-exchange-letter.pdf................................16

Letter from Governor Robert F. McDonnell to Secretary Kathleen
Sebelius (Dec. 14, 2012),
Amicus Br. for the Commonwealth of Virginia on Behalf of
Defs.-Appellees,

*King v. Burwell*, 759 F.3d 358 (4th Cir. 2014) (No. 14-1158)
(ECF No. 36-1)..................................................................................15

Linda J. Blumberg, et al.,
Halbig v. Burwell: *Potential Implications for ACA, Coverage and
Subsidies*, Urban Institute (July 2014),
http://www.urban.org/UploadedPDF/413183-Halbig-v-Burwell-
Potential-Implications-for-ACA-Coverage-and-Subsidies.pdf ...................... 6, 18

Memorandum from Comm'r Sandy Praeger, Kan. Ins. Dep't, to
Special Comm. on Fin. Insts. & Ins (Oct. 24, 2011),
http://www.ksinsurance.org/hbexplan/files/slcfii/Exchange_Requi
rements.pdf.....................................................................................17

Press Release, Office of the Governor, Brownback Administration
will not support Obamacare exchange (Nov. 11, 2012),
https://governor.ks.gov/media-room/media-
releases/2012/11/08/brownback-administration-will-not-support-
obamacare-exchange .........................................................................18

*The fee you pay if you don't have health coverage*,
HealthCare.gov, https://www.healthcare.gov/fees-exemptions/fee-
for-not-being-covered/ ........................................................................9

# GLOSSARY

| | |
|---|---|
| ACA | Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 |
| FFE | Federally-facilitated Exchange |
| IRS Rule | Final regulations, Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377 (May 23, 2012) (codified at 26 C.F.R. § 1.36B-1(k)) |
| JA | Joint Appendix |
| Secretary | Secretary of the United States Department of Health and Human Services |

**INTEREST OF AMICI CURIAE**

The Commonwealth of Virginia and the States of Maine, Mississippi, North Carolina, and Pennsylvania are "FFE States" that elected to forgo establishing their own Exchange under the ACA with the understanding that relying on a federally-facilitated Exchange would not harm State citizens or interfere with State insurance markets. Sharing that same understanding, the States of Arkansas, Delaware, Iowa, Illinois, New Hampshire, and New Mexico implemented a federally-facilitated Exchange through a State Partnership Option, retaining responsibility for certain core functions while leveraging the shared federal infrastructure to ensure financial viability. The States of California, Hawaii, Maryland, Oregon, New York, Vermont, and Washington each created their own Exchange but agree that the ACA and the IRS Rule provide that premium-assistance tax credits are available to residents of all States.[1]

The Amici States here will all be affected by the outcome of this litigation. If Appellants' erroneous construction of the ACA were adopted, it would deprive millions of low- and moderate-income Americans of billions of dollars in federal premium assistance needed to buy health insurance, and it would disrupt State insurance markets throughout the United States. Even States that operate their own Exchanges are concerned that insurance-market failures in FFE States would ripple

---

[1] This brief is authorized under Fed. R. App. P. 29(a) and Circuit Rule 29.

into their own insurance markets, threatening the ability of the ACA to operate as a comprehensive nationwide program.  Accordingly, Amici States join together here to urge affirmance of the district court's judgment.

## SUMMARY OF ARGUMENT

Under Appellants' interpretation of the ACA, the citizens of States that rely on a federally-facilitated Exchange would be denied federal premium assistance, and those States' insurance markets would be rendered dysfunctional.  There is no plausible reason to believe that Congress intended such a draconian result.  Under the *Pennhurst* doctrine, Congress must give States clear notice of conditions imposed under Spending Clause statutes.  But there was no such clear notice here. To the contrary, State officials reasonably assumed that federal premium assistance would be available regardless of whether a State chose to establish its own Exchange or rely on a federally-facilitated Exchange.

The Tenth Amendment's prohibition on federal coercion of States provides yet another reason to reject Appellants' arguments.  Under Appellants' interpretation, the ACA would raise serious constitutional questions by threatening harm to State citizens and insurance markets as a means of pressuring State governments into carrying out a federal directive to set up Exchanges. Constitutional-avoidance principles weigh heavily against such an interpretation.

2

**ARGUMENT**

I.    **In the thirty-four States with federally-facilitated Exchanges, millions of citizens depend on premium-assistance tax credits to afford the health insurance that the ACA requires them to purchase.**

As the Supreme Court recognized two years ago in *National Federation of Independent Businesses v. Sebelius* ("*NFIB*"), Congress enacted the ACA "to increase the number of Americans covered by health insurance and decrease the cost of health care."[2]  The Court in *NFIB* upheld one pillar of the ACA, the "individual mandate," which requires most Americans to maintain "minimum essential coverage" for themselves and their dependents.[3]  The other two pillars are the premium-assistance tax credits, at issue in this case, and the guaranteed-issue/community-rating provisions, which require insurers to provide coverage and set premiums without regard to a person's medical history or medical condition. Judge Edwards described these three pillars as three legs of the stool supporting the ACA.[4]

Minimum essential coverage may be obtained through an eligible employer-sponsored plan, a government program, or individual health-insurance policies,

_____

[2] 132 S. Ct. 2566, 2580 (2012).

[3] 26 U.S.C. § 5000A(a).  *See NFIB*, 132 S. Ct. at 2580, 2601.

[4] JA 418-21 (Edwards, J., dissenting).

3

including those purchased on an Exchange.[5]  Each State was required to establish

an Exchange by January 1, 2014.[6]  Congress offered generous grants to assist

States in doing so.[7]  But if a State elected not to establish an Exchange, or failed to

do so, the ACA directed the Secretary to "establish and operate such Exchange

within the State."[8]

    In order to help individual Americans *afford* the health insurance that the

individual mandate *requires* them to buy, Congress provided tax credits to offset

the premium cost.  In 26 U.S.C. § 36B, such credits are provided to "an applicable

taxpayer" (§ 36B(a))—one whose income, considering family size, is between

100% and 400% of the federal poverty level (§ 36B(c)(1)(A)).  The ACA provided

additional "cost-sharing reductions" to such individuals.[9]

    Upon the request of an Exchange, the Secretary makes an advance

determination of the tax credit amount and cost-sharing reduction, and notifies the

---

[5] 42 U.S.C. § 18031(b)(1).

[6] *Id.*

[7] 42 U.S.C. § 18031(a).

[8] 42 U.S.C. § 18041(c)(1).

[9] 42 U.S.C. § 18071(c).

Exchange accordingly.[10]  The issuer of a qualified health plan carried on the Exchange must then reduce the premium by the amount of the advance payment.[11]

It is difficult to exaggerate the importance of premium-assistance tax credits to enable low- and moderate-income Americans to buy quality health insurance. The Henry J. Kaiser Family Foundation has built a widely utilized "Health Reform Subsidy Calculator" to estimate the cost of insurance and the value of the subsidy.[12]  The calculator estimates, for instance, that a single 36-year-old mother of two children living in Richmond, Virginia, earning $25,000 a year (128% of the federal poverty level), could purchase a silver-level health insurance plan for her family for an annual premium of $5,941, with 92% of that cost ($5,441) defrayed by the tax credit—meaning that she would pay only $500 per year.  A single, 52-year-old man earning $20,000 (174% of the poverty level) would face a premium of $4,639, but 78% ($3,617) would be covered by the tax credit, costing him only $1,022 per year.

---

[10] 42 U.S.C. § 18082(a), (c)(2)(A), (c)(3).

[11] *Id.* § 18082(c)(2)(B), (c)(3).

[12] Kaiser Family Found., *Subsidy Calculator* (2014), http://kff.org/interactive/subsidy-calculator/.  The district court referenced the calculator in its opinion.  JA 329.

The Urban Institute estimates that 11.8 million individuals will enroll in FFE State marketplaces in 2016.[13] Of those enrollees, an estimated 7.3 million are expected to be eligible to receive premium-assistance tax credits.[14] The total estimated subsidy in all thirty-four FFE States in 2016 is $36.1 billion.[15] Table 1 in the report,[16] reproduced below, shows the number of projected enrollees and the value of the premium subsidy in each of the FFE States (including our sister States of Kansas and Nebraska, which urge reversal):

| State | Projected 2016 Total Marketplace Enrollment | Projected 2016 Subsidized Marketplace Enrollment | Estimated Subsidy Spending |
|---|---|---|---|
| Alabama | 252,000 | 153,000 | $725,985,000 |
| Alaska | 51,000 | 36,000 | $156,420,000 |
| Arizona | 391,000 | 249,000 | $1,166,316,000 |
| Arkansas | 147,000 | 95,000 | $495,615,000 |
| Delaware | 34,000 | 21,000 | $93,975,000 |
| Florida | 1,437,000 | 931,000 | $4,756,479,000 |
| Georgia | 608,000 | 383,000 | $2,083,903,000 |
| Illinois | 566,000 | 315,000 | $1,420,965,000 |

---

[13] Linda J. Blumberg, et al., Halbig v. Burwell: *Potential Implications for ACA, Coverage and Subsidies*, Urban Institute 1 (July 2014), *available at* http://www.urban.org/UploadedPDF/413183-Halbig-v-Burwell-Potential-Implications-for-ACA-Coverage-and-Subsidies.pdf.

[14] *Id*.

[15] *Id*. at 1-2.

[16] *Id*. at 2.

6

| State | Projected 2016 Total Marketplace Enrollment | Projected 2016 Subsidized Marketplace Enrollment | Estimated Subsidy Spending |
|---|---|---|---|
| Indiana | 369,000 | 231,000 | $1,256,871,000 |
| Iowa | 145,000 | 78,000 | $396,084,000 |
| Kansas | 169,000 | 98,000 | $435,610,000 |
| Louisiana | 305,000 | 187,000 | $1,019,337,000 |
| Maine | 82,000 | 55,000 | $279,510,000 |
| Michigan | 467,000 | 290,000 | $1,271,070,000 |
| Mississippi | 162,000 | 106,000 | $641,512,000 |
| Missouri | 349,000 | 215,000 | $1,039,095,000 |
| Montana | 98,000 | 60,000 | $264,780,000 |
| Nebraska | 136,000 | 71,000 | $330,008,000 |
| New Hampshire | 79,000 | 47,000 | $183,770,000 |
| New Jersey | 396,000 | 229,000 | $969,815,000 |
| North Carolina | 615,000 | 376,000 | $1,792,392,000 |
| North Dakota | 54,000 | 29,000 | $144,884,000 |
| Ohio | 498,000 | 322,000 | $1,383,312,000 |
| Oklahoma | 235,000 | 152,000 | $797,240,000 |
| Pennsylvania | 677,000 | 402,000 | $2,138,640,000 |
| South Carolina | 283,000 | 183,000 | $871,446,000 |
| South Dakota | 66,000 | 37,000 | $206,756,000 |
| Tennessee | 378,000 | 225,000 | $1,216,575,000 |
| Texas | 1,683,000 | 1,092,000 | $5,582,304,000 |
| Utah | 208,000 | 127,000 | $630,047,000 |
| Virginia | 451,000 | 260,000 | $1,159,860,000 |
| West Virginia | 68,000 | 48,000 | $210,000,000 |
| Wisconsin | 269,000 | 164,000 | $882,976,000 |
| Wyoming | 45,000 | 27,000 | $139,644,000 |
| **Total [FFE] States** | **11,773,000** | **7,293,000** | **$36,143,196,000** |

Without premium-assistance tax credits, "many if not most uninsured people could not afford coverage"[17] that the individual mandate requires them to buy. Recognizing that low-income Americans cannot be penalized for failing to purchase insurance they cannot afford, Congress exempted from the individual mandate those individuals who fail to purchase health insurance because their premium cost—after tax credits are taken into account—will exceed 8% of their household income for the taxable year.[18] With federal subsidies available, only 3% of those eligible for subsidies would be exempt from the individual mandate.[19] The ACA, that is, both encourages low-income Americans to get insured and ensures that they have the wherewithal to purchase insurance. The subsidies are crucial.

But if the subsidies become unavailable in FFE States, then some 83% of those persons formerly eligible for subsidies would "end up being exempt from the individual mandate."[20] Their unsubsidized-premium cost would become unaffordable—exceeding 8% of their income. They and their families will go

---

[17] Larry Levitt & Gary Claxton, Kaiser Family Found, *The Potential Side Effects of Halbig* (July 31, 2014), http://kff.org/health-reform/perspective/the-potential-side-effects-of-halbig/.

[18] 26 U.S.C. § 5000A(e)(1)(A).

[19] Levitt & Claxton, *supra* note 17.

[20] *Id.*

uninsured, taking cold comfort, perhaps, in knowing that they will not *also* have to pay a tax penalty.

The remaining 17% of currently subsidy-eligible Americans would face, if Appellants' theory prevailed, an unsubsidized-premium cost that is less than 8% of their income.  The individual mandate would require them to purchase that insurance at full cost, and they would pay a penalty for not doing so.  In 2015, the penalty is the higher of 2% of yearly household income (not to exceed the cost of a "bronze" plan), or $325 per adult and $162.50 per child (not to exceed a family cap of $925).[21]

## II.    Under Appellants' implausible interpretation, the ACA would effectively coerce States into building Exchanges by burdening their citizens and damaging their insurance markets if they chose otherwise.

Judge Edwards correctly recognized that accepting Appellants' theory would "gut"[22] the ACA, given the interrelatedness of the individual mandate, the premium subsidies, and the guaranteed-issue/community-rating provisions.  Each

---

[21] *See The fee you pay if you don't have health coverage*, HealthCare.gov, https://www.healthcare.gov/fees-exemptions/fee-for-not-being-covered/ (last visited Oct. 28, 2014).

[22] JA 407 (Edwards, J., dissenting).

leg of the "three-legged stool" is essential.[23]  As the four Justices who reached the

issue observed in *NFIB*:

> [The] system of incentives collapses if the federal
> subsidies are invalidated.  Without the federal subsidies,
> individuals would lose the main incentive to purchase
> insurance inside the exchanges, and some insurers may
> be unwilling to offer insurance inside of exchanges.
> With fewer buyers and even fewer sellers, the exchanges
> would not operate as Congress intended and may not
> operate at all.[24]

Indeed, a recent Rand Corporation study stated that "in scenarios in which the tax

credits are eliminated, our model predicts a near 'death spiral,' with very sharp

premium increases and drastic declines in individual market enrollment."[25]

According to Appellants, these dire consequences were simply Congress's

use of "sticks" and "carrots" to incentivize States to create their own Exchanges

---

[23] JA 418 (Edwards, J., dissenting).

[24] 132 S. Ct. at 2674 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

[25] Christine Eibner & Evan Saltzman, Rand Corp., *Assessing Alternative Modifications to the Affordable Care Act—Impact on Individual Market Premiums and Insurance Coverage* 2 (Oct. 2014), *available at* http://www.rand.org/pubs/research_reports/RR708.html.  *See also* Levitt & Claxton, *supra* note 17 ("The result could be what is commonly called a 'death spiral,' as healthy people exit the market and premiums rise even more.").

and to deter them from relying on federally-facilitated Exchanges.[26]  But that is not a plausible reading of the ACA.  The *Pennhurst* doctrine forecloses that interpretation because Congress did not give States clear notice that their citizens would be punished and their insurance markets ruined if they elected to rely on a federally-facilitated Exchange.  And constitutional-avoidance principles likewise weigh heavily against Appellants' interpretation because the threat of such consequences to pressure States into building their own Exchanges would raise serious constitutional questions under the Tenth Amendment.

## III. Appellants' interpretation of the ACA is implausible under the *Pennhurst* doctrine because Congress did not give States clear notice that electing to forgo a State-based exchange would deprive State citizens of federal subsidies and wreck State insurance markets.

### A. The *Pennhurst* doctrine requires that Congress give States clear notice of conditions imposed under Spending Clause statutes.

When Congress seeks the States' cooperation to implement federal legislation enacted under the Spending Clause,[27] the States are entitled to clear notice about the conditions that will be imposed.[28]  In *Pennhurst State School & Hospital v. Halderman*,[29] the Court described that clear-statement rule as follows:

---

[26] Appellants' Br. 3.

[27] U.S. Const. art. I, § 8, cl. 1.

[28] *NFIB*, 132 S. Ct. at 2602, 2605-06.

[29] 451 U.S. 1 (1981).

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.  The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract."  There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.  Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.  By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.[30]

In 2006, the Court explained that, in applying the *Pennhurst* doctrine, the statute must be interpreted from "*the perspective of a state official* who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds."[31]  That is:

> We must ask *whether such a state official would clearly understand* that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees.  In other words, [we must ask] whether the IDEA [furnishes *clear notice* regarding the liability at issue in this case].[32]

---

[30] *Id.* at 17 (citations and footnote omitted).

[31] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (emphasis added).

[32] *Id.* (emphasis added; alterations in original).

12

The Court applied *Pennhurst* again in *NFIB*, striking down the ACA's provision that denied all Medicaid funding to States that failed to adopt Medicaid expansion.[33]  Writing for the plurality, Chief Justice Roberts explained that the States were not on fair notice that participating in the Medicaid program would subject them to such a draconian, later-imposed condition.[34]  While "Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or 'retroactive' conditions."[35]

This Court too has repeatedly applied *Pennhurst*.  Sometimes it has found that Congress provided clear notice;[36] sometimes not.[37]  Here, there was no clear

---

[33] 132 S. Ct. at 2602-06 (plurality opinion by Roberts, C.J., joined by Breyer and Kagan, JJ.); *id.* at 2666 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

[34] 132 S. Ct. at 2602-06 (plurality).

[35] *Id.* at 2606.

[36] *E.g.*, *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1165 (D.C. Cir. 2004) (holding that the Civil Rights Remedies Equalization Act (CRREA) made it "undeniably clear" that recipients of federal assistance were not immune from claims under § 504 of the Rehabilitation Act of 1973); *Lampkin v. District of Columbia*, 27 F.3d 605, 611 (D.C. Cir. 1994) (holding that B. McKinney Homeless Assistance Act provided clear notice of the "well-defined obligations" that State undertake when they elect to accept federal funds).

[37] *E.g.*, *Doe by Fein v. District of Columbia*, 93 F.3d 861, 867 (D.C. Cir. 1996) (per curiam) (holding that § 5106a(b)(2) of the Child Abuse Prevention and Treatment Act "fails to unambiguously confer an enforceable right upon its beneficiaries"); *Edwards v. District of Columbia*, 821 F.2d 651, 656, 658-59 (D.C. Cir. 1987)

13

notice that States would be deprived of federal premium assistance if they relied on federally-facilitated Exchanges.

> **B.** **The Amici States had no clear notice that relying on a federally-facilitated Exchange would harm their citizens and disrupt their insurance markets.**

Judge Edwards was right to point out the absence of record evidence that either Congress or the States interpreted the ACA as denying premium-assistance tax credits in States that did not create their own Exchange.[38] Far from signaling any punishment associated with choosing a federally-facilitated Exchange, the ACA promised "State Flexibility Relating to Exchanges."[39] A State could elect to establish an Exchange for itself, but if it opted not to, the Secretary would establish "such Exchange" for the State.[40]

The Amici States that opted for FFEs, or that created FFEs through a federal partnership model, did so without clear notice of the adverse consequences that Appellants say now result from that choice. For example:

- Virginia Governor Robert F. McDonnell's correspondence with Secretary Sebelius memorialized the Government's assurances "that

---

(holding that the United States Housing Act of 1937, 42 U.S.C. § 1437p, did not provide clear notice of statutory rights enforceable under 42 U.S.C. § 1983).

[38] JA 409, 413, 431 (Edwards, J., dissenting).

[39] 124 Stat. 120 (Title I, Subtitle D, part 3).

[40] 42 U.S.C. § 18041(c).

the choice of a state based, federal, or hybrid/partnership exchange are all equally valid in complying with the law."[41]  Governor McDonnell said that Virginia had no evidence to suggest any "clear benefits of a state run exchange to our citizens."[42]

- New Hampshire enacted legislation prohibiting it from establishing a State-based Exchange[43] but assuming the availability of tax credits through a federally-facilitated Exchange; New Hampshire created an advisory board whose members must include a member of the public "who can reasonably be expected to purchase individual coverage through the exchange with *the assistance of a premium tax credit*."[44]

- Arkansas Governor Mike Beebe said that Arkansas elected an FFE partnership model "consistent with the goals" of the ACA "to increase the number of insured residents in our State; to promote health and well-being; to lower health-care costs; and to eliminate health disparities."[45]

- Delaware Governor Jack Markell said that in selecting the partnership model, Delaware sought to "leverage a shared federal infrastructure, retain management of critical areas most directly impacting Delawareans, and ensure financial viability in light of the size of our

---

[41] Letter from Governor Robert F. McDonnell to Secretary Kathleen Sebelius (Dec. 14, 2012), Amicus Br. for the Commonwealth of Virginia on Behalf of Defs.-Appellees at 25a, *King v. Burwell*, 759 F.3d 358 (4th Cir. 2014) (No. 14-1158) (ECF No. 36-1).

[42] *Id.* at 26a.

[43] N.H. Rev. Stat. Ann. § 420-N:7 (LexisNexis 2014).

[44] N.H. Rev. Stat. Ann. § 420-N:10, I(h)(1) (LexisNexis 2014) (emphasis added).

[45] Letter from Governor Mike Beebe to Secretary Kathleen G. Sebelius (Dec. 12, 2012), *available at* https://www.cms.gov/CCIIO/Resources/Technical-Implementation-Letters/Downloads/ar-exchange-letter.pdf.

population and market."[46]  He added that this model "provides an opportunity to address the needs of Delaware's health care consumers . . . in a fiscally responsible manner as we work together to ensure access to quality affordable health care for all Delawareans."[47]

- Illinois Governor Pat Quinn said that Illinois opted for a federal partnership exchange "to increase access to quality health care and improve the health of the people of Illinois," noting that "Illinoisans deserve *all the benefits afforded to them*" under the ACA.[48]

Kansas and Nebraska have filed an amicus brief supporting Appellants,[49] but neither offers contemporaneous evidence that its officials were aware when the ACA was passed, or when they made their elections, that becoming an FFE State would deprive their citizens of hundreds of millions of dollars in federal subsidies. In fact, the evidence strongly suggests the opposite.

Governor Dave Heineman explained in November 2012 that Nebraska had declined to create its own Exchange due to the "extreme cost" of building and

---

[46] Letter from Governor Jack A. Markell to Secretary Kathleen Sebelius (Nov. 14, 2012), *available at* https://www.cms.gov/CCIIO/Resources/Technical-Implementation-Letters/Downloads/de-exchange-letter.pdf.

[47] *Id.*

[48] Letter from Governor Pat Quinn to Gary Cohen, Centers for Medicare & Medicaid Services (Oct. 16, 2012) (emphasis added), *available at* https://www.cms.gov/CCIIO/Resources/Technical-Implementation-Letters/Downloads/il-exchange-letter.pdf.

[49] Br. of the States of Kansas and Nebraska, as Amici Curiae in Supp. of Reversal, Doc. 1515419 (D.C. Cir. Oct. 3, 2014).

operating it.[50]  But the Governor said there was no operational difference with a

federally-facilitated Exchange and that the choice would have no adverse affect on

Nebraskans:

> Whether a state runs a health exchange, or that is done by
> the federal government, all citizens will have the option
> to purchase insurance policies through an exchange.  A
> state decision either way does not affect that access . . . .
>
> . . . On the key issues, there is no real operational
> difference between a federal exchange and a state
> exchange.[51]

Similarly, the Kansas Insurance Department determined in the Fall of 2011

that a State Exchange and a federally-facilitated Exchange would both handle

premium-assistance-tax-credit determinations.[52]  When Governor Sam Brownback

announced in December 2012 that Kansas would not build its own Exchange, his

stated reason had nothing to do with tax credits.  He said that:

> Kansans feel Obamacare is an overreach by Washington
> and have rejected the state's participation in this federal

---

[50] Gov. Heineman on Federal Health Care Law: $646 Million State Exchange Too
Costly—State of Nebraska to Participate in Federal Health Exchange (Nov. 15,
2012), *available at*
http://www.governor.nebraska.gov/news/2012/11/15_health_care.html.

[51] *Id.*

[52] *See* Memorandum from Comm'r Sandy Praeger, Kan. Ins. Dep't, to Special
Comm. on Fin. Insts. &  Ins., at 8 of 13 and 12 of 13 (Oct. 24, 2011), *available at*
http://www.ksinsurance.org/hbexplan/files/slcfii/Exchange_Requirements.pdf.

17

program.  My administration will not partner with the
federal government to create a state-federal partnership
insurance exchange because we will not benefit from it
and *implementing it could costs Kansas taxpayers
millions of dollars*.[53]

Conspicuously absent was any notion that an FFE would deprive 100,000 Kansans

of more than $435 million *annually* in premium subsidies.[54]

What is more, from "the perspective of a state official,"[55] once the IRS Rule

was finalized on May 23, 2012—confirming that premium-assistance tax credits

are available without regard to whether the Exchange is State-built or federally

facilitated[56]—State officials could reasonably rely on that authoritative

interpretation, particularly "given the tremendous complexity"[57] of the statute.

---

[53] *See* Press Release, Office of the Governor, Brownback Administration will not
support Obamacare exchange (Nov. 8, 2012) (emphasis added), *available at*
https://governor.ks.gov/media-room/media-releases/2012/11/08/brownback-
administration-will-not-support-obamacare-exchange.

[54] Blumberg, et al., *supra* note 13, at 2.

[55] *Arlington Cent.*, 548 U.S. at 296.

[56] Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,378 (May 23,
2012) (codified at 26 C.F.R. § 1.36B-1(k)).

[57] *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1016 (D.C. Cir. 1999).

**C.    Nothing in the text, structure, purpose or history of the ACA clearly indicated that States would be deprived of federal premium assistance if they chose to rely on federally-facilitated Exchanges.**

The ACA is one of the most complicated statutory programs Congress has ever devised.  It comprises "10 titles stretch[ing] over 900 pages and contain[ing] hundreds of provisions."[58]  Nothing in the text, structure, purpose or history of the ACA provided States with clear notice that relying on a federally-facilitated Exchange would bar their citizens from receiving premium-assistance subsidies.

Under Appellants' interpretation, the provision barring federal subsidies in FFE States is buried in 26 U.S.C. § 36B.  The phrase "an Exchange established by the State under [§] 1311" appears in the provision describing part of the calculation of the tax credit (§ 36B(b)(2)(A)), and again in the definition of "coverage month" (§ 36B(c)(2)(A)).  Appellants conclude from that language that Congress intended to deny tax credits to citizens in FFE States.

But these isolated phrases fail the clear-notice test.  In *Barbour*, for instance, this Court found that CRREA provided clear notice because it plainly said that "[a] state shall not be immune under the Eleventh Amendment . . . for a violation of section 504 . . . or the provisions of any other Federal statute prohibiting

---

[58] *NFIB*, 132 S. Ct. at 2580.

19

discrimination by recipients of Federal financial assistance."[59]  And in *Lampkin*,

the B. McKinney Homeless Assistance Act provided clear notice because it said

the State coordinator "shall . . . once every 2 years, gather data on the number and

location of homeless children and youth in the State . . . [and] develop and carry

out the State plan . . . ."[60]  There was no similar clear notice to States in § 36B, let

alone anywhere else in the "900 pages"[61] of the ACA.

By focusing narrowly on § 36B, moreover, Appellants violate an elementary

rule of statutory construction.  "Over and over," the Supreme Court has "stressed

that '[i]n expounding a statute, we must not be guided by a *single sentence or*

*member of a sentence*, but look to the provisions of the *whole law*, and to its object

and policy.'"[62]  Even when a particular reading of a sentence in one section may be

"the most natural reading . . . when viewed in isolation, . . . statutory language

must always be read in its proper context . . . look[ing] to the particular statutory

---

[59] 374 F.3d at 1164 (quoting 42 U.S.C. § 2000d-7(a)(1)).

[60] 27 F.3d at 611 (quoting 42 U.S.C. § 11432(d)).

[61] *NFIB*, 132 S. Ct. at 2580.

[62] *United States Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore*, 49 U.S. 113, 122 (1849)) (emphasis added).  *See also Chemical Mfrs. Ass'n v. EPA*, 217 F.3d 861, 867 (D.C. Cir. 2000) (relying on same quotation).

20

language at issue, as well as the language and design of the statute as a whole."[63] This Court too has said that a provision viewed "in isolation" can appear "to admit of little or no ambiguity," but when "viewed in the context of the overall scheme," the "meaning is at variance with the literal interpretation."[64]  That describes this case.

Even if a State official scrutinized § 36B and stumbled across the phrase "an Exchange established by the State under § 1311," the reader would still have to look up the meaning of the defined term "Exchange," and then look at § 1311—codified at 42 U.S.C. § 18031—to see what that section says about it.  Thus, the language in § 36B "merely raises, rather than answers, the critical question . . . ."[65] "In answering that inquiry, we must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose,' . . . not to mention common sense . . . ."[66]

---

[63] *McCarthy v. Bronson,* 500 U.S. 136, 139 (1991).

[64] *Am. Train Dispatchers Ass'n v. ICC*, 54 F.3d 842, 849 (D.C. Cir. 1995).

[65] *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014).

[66] *Id.* (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)).

Section 18031 provides that "Each State shall, not later than January 1, 2014, establish an American Health Benefit Exchange (referred to in this title as an 'Exchange')."[67] It provides financial assistance to help them do so.[68]

But what if a State does not want to build an Exchange to carry out its obligation to establish one?  Section 18041(c) takes care of that.  If a State does not elect to create the Exchange or will not have it operational by 2014, the Secretary shall "establish and operate *such Exchange* within the State."[69]

So is a federally-facilitated Exchange ("such Exchange") the same, for purposes of the ACA, as an Exchange built by the State?  The Government has the better reading that it is, because the word "Exchange" is a term of art, and the *only* kind of Exchange defined in the ACA is an Exchange established by the State.

"Exchange" is defined in 42 U.S.C. § 300gg-91(d)(21) as "an American Health Benefit Exchange established under section 18031 of this title." Importantly, there is no *other* definition of "Exchange" and no separate definition of an Exchange established by the Secretary.  Section 18031(d) repeats the point by making it a general requirement that an Exchange "shall be a governmental

---

[67] 42 U.S.C. § 18031(b)(1).

[68] 42 U.S.C. § 18031(a).

[69] 42 U.S.C. § 18041(c)(1) (emphasis added).

agency or nonprofit entity *that is established by a State*."[70]  And the defined term "Exchange" is then used throughout the ACA, including in the tax-credit provisions in 26 U.S.C. § 36B.[71]

Returning to § 18041(c)(1), the "such Exchange" that the Secretary establishes, when the State does not, is properly treated as the Exchange established by the State.  That is so because there is no other Exchange defined in the ACA that it could be.

The clincher for this reading is the ACA's definition of a "qualified individual" under § 18032 who can enroll in an Exchange: "an individual who—(i) is seeking to enroll in a qualified health plan in the individual market offered through the Exchange; and (ii) resides *in the State that established the Exchange*."[72]  Appellants concede that, if their theory were applied to this section, *no one* would be eligible to enroll in a *federally-facilitated* Exchange because it would not be an Exchange that the State has established.  Appellants agree that *that* reading makes no sense and that the Court would have to "excise the words

---

[70] 42 U.S.C. § 18031(d)(1) (emphasis added).

[71] *See* JA 416 (Edwards, J., dissenting) ("[T]he phrase 'established by the State' in § 36B is reasonably understood to take its meaning from the cognate language in the incorporated definition in § 18031, which embraces Exchanges created by HHS on the State's behalf.").

[72] 42 U.S.C. § 18032(f)(1)(A) (emphasis added).

23

causing the absurdity."[73]  By contrast, reading "Exchange" as a single defined

term—an American Health Benefit Exchange that the *State* is required to establish,

whether by doing so itself or by letting the Secretary establish "such Exchange"[74]

on its behalf—resolves the conundrum throughout the ACA.

Appellants pay scant attention to the ACA's statutory definition of

"Exchange," relying instead on a colloquial understanding of "Exchange

established by the State."  But the statutory definition is essential, for the definition

Congress assigns is "assuredly dispositive" of its scope "for purposes of matters

that are within Congress' control."[75]  Indeed, the Supreme Court in *NFIB* found

that the individual mandate was not a "tax" for purposes of the Anti-Injunction Act

because Congress called it a "penalty," despite that the constitutionality of the

individual mandate depended on its characterization as a "tax" for constitutional

purposes.[76]  Congress can likewise say that "such Exchange" established by the

---

[73] Appellants' Br. 38.

[74] 42 U.S.C. § 18041(c)(1).

[75] *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (holding that Congress could disclaim that Amtrak is an agency of the federal government for purposes of statutory construction, although that was not dispositive of whether Amtrak was a federal instrumentality for purposes of determining the constitutional rights of persons affected by its actions).

[76] *Compare NFIB*, 132 S. Ct. at 2583 ("Congress . . . chose to describe the '[s]hared responsibility payment' imposed on those who forgo health insurance not

Secretary counts as the same Exchange established by the State in discharge of its obligation to create one under § 18031.

The ACA may not be "a *chef d'oeuvre* of legislative draftsmanship.  But we . . . must do our best, bearing in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[77]

Appellants' construction, moreover, undermines the clear purpose of the ACA, as reflected in its statutory text and structure: to provide affordable health insurance to as many Americans as possible.  We will not repeat the Government's arguments.  It suffices that the very title in which § 36B appears reads "Quality, Affordable Health Care for *All* Americans."[78]  The subtitle, similarly, is "Affordable Coverage Choices for *All* Americans."[79]  Congress's choice of the word "all" shows that the phrasal string Appellants pluck from § 36B was not

---

as a 'tax,' but as a 'penalty'"), *with id.* at 2594 ("It is up to Congress whether to apply the Anti-Injunction Act to any particular statute, so it makes sense to be guided by Congress's choice of label on that question. That choice does not, however, control whether an exaction is within Congress's constitutional power to tax.").

[77] *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (citation and quotation omitted).

[78] 124 Stat. 130 (emphasis added).

[79] 124 Stat. 213 (emphasis added).

meant to deny affordable health coverage and to destroy insurance markets in FFE States.

As for legislative history, while Judges Griffith and Randolph said that "scant legislative history sheds little light on the precise question of the availability of subsidies on federal Exchanges,"[80] to the States' ears, Congress spoke loudly and one-sidedly to the point at issue here:

- Senator Baucus said "tax credits will help to ensure *all* Americans can afford quality health insurance."[81]

- Senator Johnson said the ACA will "form health insurance exchanges in *every* State through which those limited to the individual market will have *access to affordable and meaningful coverage*."[82]

- Senator Durbin said "we will help you pay your health insurance premiums, give you tax breaks to pay those premiums.  That means a lot of people who today cannot afford to pay for health insurance premiums will be able to."[83]  He later added that "30 million Americans today who have no health insurance . . . *will qualify for . . . tax credits* to help them pay their premiums so they can have and afford health insurance."[84]

- Senator Bingaman said that the ACA "includes creation of a new health insurance exchange in each State which will provide

---

[80] JA 395.

[81] 155 Cong. Rec. S11,964 (Nov. 21, 2009) (emphasis added).

[82] 155 Cong. Rec. S13,375 (Dec. 17, 2009) (JA 283) (emphasis added).

[83] 155 Cong. Rec. S12,779 (Dec. 9, 2009).

[84] 155 Cong. Rec. S13,559 (Dec. 20, 2009) (JA 279) (emphasis added).

26

> Americans . . . meaningful private insurance *as well as refundable tax credits to ensure that coverage is affordable*."[85]

Indeed, one of the ACA's staunchest opponents, Representative Paul Ryan, criticized the law *because* it made tax credits available in every State:

> [I]t's a new, open-ended entitlement that basically says that *just about everybody in this country*—people making less than $100,000, you know what, if your health care expenses exceed anywhere from 2 to 9.8 percent of your adjusted gross income, don't worry about it, taxpayers got you covered, the government is going to subsidize the rest.[86]

None of those statements would have made sense had Congress understood that premium tax credits would be *unavailable* in FFE States. Tellingly, even Appellants' amici—Jonathan Adler and Michael Cannon, the two conservative commentators who later published the roadmap for Appellants' legal challenge—admitted that they "were both surprised to discover this feature of the law and initially characterized it as a 'glitch.'"[87] Judge Edwards put it more pointedly: "Appellants' incentive story is a fiction, a *post hoc* narrative concocted to provide

---

[85] 155 Cong. Rec. S12,358 (Dec. 4, 2009) (JA 285) (emphasis added).

[86] Verbatim Transcript, *Markup of the Reconciliation Act of 2010, H. Comm. on Budget*, 111th Cong., 2010 WL 941012 (Mar. 15, 2010) (emphasis added)

[87] Jonathan H. Adler & Michael F. Cannon, *Taxation Without Representation: The Illegal IRS Rule To Expand Tax Credits Under the PPACA*, 23 Health Matrix 119, 123 (2013).

a colorable explanation for the otherwise risible notion that Congress would have wanted insurance markets to collapse in States that elected not to create their own Exchanges."[88]

From the States' perspective, then, not only was there no "clear notice" that opting for a federally-facilitated Exchange would deny citizens tax credits, but a chorus of congressional leaders uniformly suggested the opposite. Indeed, the most significant aspect of the legislative history is the *absence* of any evidence supporting Appellants' interpretation.

"Congress' silence in this regard can be likened to the dog that did not bark,"[89] from which Sherlock Holmes deduced that the perpetrator must have been known to the dog.[90] If anyone in Congress had actually proposed coercing the States in the manner claimed by Appellants, it would have engendered howls of protest from the ACA's opponents and from those who normally oppose attempts "to aggrandize federal authority at the expense of the States."[91] But like the dog

---

[88] JA 413 (Edwards, J., dissenting).

[89] *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991).

[90] *Id.* (citing A. Doyle, *Silver Blaze*, *in The Complete Sherlock Holmes* 335 (1927)).

[91] Amicus Mem. of Commonwealth of Virginia in Supp. of Pls.' Mot. for Summ. J. at 2, *Halbig v. Sebelius*, No. 1:13-cv-00623 (D.D.C. Nov. 19, 2013) (ECF No. 60). Virginia disavows the argument in that amicus brief, by its previous Attorney

that didn't bark, there was not so much as a growl of disapproval at the time about the iniquitous scheme alleged here.

The best that Appellants and their amici come up with are YouTube videos of Professor Jonathan Gruber, a private citizen at non-governmental meetings in January 2012, years after the ACA was enacted.[92] But Appellants fail to demonstrate that Professor Gruber's message was disseminated to the State officials responsible for determining whether to build their own Exchange. In any event, Gruber later corrected himself, calling his earlier statements a mistake.[93]

Judge Edwards made our point about *Pennhurst* when he wrote that the ACA provided no "notice to States that their taxpayers will be denied subsidies if the State elects to have HHS create an Exchange on its behalf."[94] Indeed, if that

---

General, supporting the *Halbig* plaintiffs. It focused too narrowly on the language of § 36B without examining the broader context of the ACA, and it overlooked Governor McDonnell's stated assumption that *no* harm would befall Virginians by forgoing a State-based exchange. *See supra* at 14-15. Because the district court neither mentioned nor accepted the argument of the prior Attorney General, Virginia is not estopped from advocating the correct legal position here. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169-70 (2010).

[92] Appellants' Br. 5, 48; Cornyn Amici Br. 18-19.

[93] Jonathan Cohn, *Jonathan Gruber: 'It Was Just a Mistake,' An Obamacare architect explains a 2012 quote that's fueling critics*, New Republic (July 25, 2014), *available at* http://www.newrepublic.com/article/118851/jonathan-gruber-halbig-says-quote-exchanges-was-mistake.

[94] JA 423 (Edwards, J., dissenting).

consequence could not be discerned by the federal district judge below,[95] nor by the one in *King*,[96] nor by (now) four circuit court judges,[97] how could the Amici States have had "clear notice"?

## IV. The doctrine of constitutional avoidance requires rejecting Appellants' interpretation of the ACA because their reading raises serious constitutional questions under the Tenth Amendment.

As the Court said in *NFIB*, "it is well established that if a statute has two possible meanings, one of which violates the Constitution, courts should adopt the meaning that does not do so."[98]  The reading that would be unconstitutional should be avoided unless it is "unavoidable."[99]

The doctrine of constitutional avoidance requires the Court to reject Appellants' legal theory here.  Under Appellants' implausible interpretation of the ACA, Congress intended to coerce States into creating their own Exchanges by threatening to burden State citizens and to wreck State insurance markets if State

---

[95] JA 361-62 (Friedman, J.).

[96] *King v. Sebelius*, 997 F. Supp. 2d 415, 427-32 (E.D. Va. 2014) (Spencer, J.), *aff'd sub nom. King v. Burwell*, 759 F.3d 358 (4th Cir. 2014), *cert. pending*, No. 14-114 (U.S. filed July 31, 2014).

[97] *King*, 759 F.3d at 372-73 (Gregory, J., joined by Thacker, J.); *id.* at 376 (Davis, J., concurring); JA 435 (Edwards, J., dissenting).

[98] 132 S. Ct. at 2593.

[99] *Id.*

governments did not comply.  Such a program would raise serious constitutional questions under the Tenth Amendment.

The Supreme Court recounted in *New York v. United States*[100] and *Printz v. United States*[101] the Framers' choice to adopt a federal system that operates without coercing States into implementing federal programs.  In *NFIB*, the Court explained that cutting off all Medicaid funding to States that declined Medicaid expansion constituted "much more than relatively mild encouragement—it is a gun to the head."[102]  It "'crossed the line distinguishing encouragement from coercion,'"[103] serving "no purpose other than to force unwilling States" to comply.[104]

Yet in this case, Appellants themselves state that the scheme they attribute to Congress would be at least as coercive.  They call it "*the same* 'too good to turn down' offer of huge federal grants to *coerce* states to expand Medicaid." [105]

---

[100] *New York v. United States*, 505 U.S. 144, 164-66 (1992).

[101] *Printz v. United States*, 521 U.S. 898, 919-22 (1996).

[102] 132 S. Ct. at 2604 (plurality) (quotation omitted); *id.* 2659-66 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (agreeing that mechanism to force Medicaid expansion was coercive).

[103] *Id.* at 2603 (plurality) (quoting *New York*, 505 U.S. at 175).

[104] *Id*.

[105] Appellants' Br. 47 (emphasis added).

31

"Congress," Appellants explain, "could quite reasonably believe that elected state officials would not want to explain to voters that they had deprived them of billions of dollars by failing to establish an Exchange."[106]

Because Appellants' interpretation of the ACA assumes that Congress acted unconstitutionally, it must be rejected in favor of the Government's more plausible reading, which avoids that infirmity.

## CONCLUSION

The Court should affirm the ruling of the district court.

Respectfully submitted,

By:＿＿/s/＿＿＿＿＿＿＿＿＿＿＿

MARK R. HERRING
Attorney General of Virginia

TREVOR S. COX
Deputy Solicitor General
tcox@oag.state.va.us

STUART A. RAPHAEL*
Solicitor General of Virginia
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
sraphael@oag.state.va.us

*Counsel of Record for Amici Curiae

November 3, 2014

---

[106] Appellants' Br. 32-33.

## CERTIFICATE OF COMPLIANCE

I certify that: (1) this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 6,744 words, according to the count of Word 2007, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and (2) this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman 14-Point Font.

/s/
_____
Stuart A. Raphael

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2014, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/
_____
Stuart A. Raphael