*EN BANC* ARGUMENT SCHEDULED FOR DECEMBER 17, 2014

Case No. 14-5018

===============================================

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

Jacqueline Halbig, *et al.*,

*Plaintiffs-Appellants*,

*v.*

Sylvia Mathews Burwell, in her official capacity as
Secretary of Health and Human Services, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the District of Columbia

_____

**CORRECTED *AMICUS CURIAE* BRIEF OF PUBLIC HEALTH DEANS,
CHAIRS, AND FACULTY IN SUPPORT OF APPELLEE**

_____

H. Guy Collier*
Ankur J. Goel*
Cathy Z. Scheineson
Amandeep S. Sidhu
Lauren A. D'Agostino
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Telephone: 202-756-8000
Facsimile: 202-756-8087
gcollier@mwe.com

Dated: November 3, 2014

Counsel for *Amici Curiae*
*Counsel of Record

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a) and Circuit

Rules 26.1 and 29(b), deans and professors of public health and public health law

("Public Health Deans, Chairs, and Faculty") hereby state that:

1. Public Health Deans, Chairs, and Faculty are deans, chairs, and professors

at leading public health and public health law schools in the United States.

2. No party to this filing has a parent corporation, and no publicly held

corporation owns 10% or more of the stock of any party to this filing.

# CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amici* Public Health Deans, Chairs, and Faculty submit this certificate as to parties, rulings, and related cases.

## Parties

To *amici*'s knowledge, other than *Amici* Public Health Deans, Chairs, and Faculty, the briefs of Appellants have listed all parties and participants in the proceedings below.

## Ruling Under Review

To *amici*'s knowledge, references to the Ruling Under Review appear in the Briefs for Appellants.

## Related Cases

To *amici*'s knowledge, this case has not previously been before this Court and there are no pending related cases.

## Statement Regarding Appendix

*Amici* Public Health Deans, Chairs, and Faculty adopt the Joint Appendix filed by Appellants.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ..................................................... ii

CERTIFICATE AS TO PARTIES, RULING, AND RELATED
     CASES ..................................................................................................... iii

TABLE OF AUTHORITIES .............................................................. vii

STATEMENT OF IDENTITY, INTEREST OF THE *AMICI
CURIAE*, AND SOURCE OF AUTHORITY TO FILE .............................1

STATEMENT OF AUTHORSHIP AND FINANCIAL
     CONTRIBUTION .....................................................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................3

ARGUMENT ......................................................................................6

I.     ELIMINATING ACCESS TO THE PREMIUM TAX CREDIT
     FOR RESIDENTS OF THE 34 STATES THAT HAVE NOT
     ELECTED TO ESTABLISH A STATE EXCHANGE WILL
     HARM POPULATION HEALTH AND DEFEAT THE
     PUBLIC HEALTH GOALS OF THE ACA. ...............................................6

     A.     The ACA Rests On A Population-Wide Health Goal Of
          Near-Universal Access To Insurance – A Goal Of
          Special Importance To Residents Of States That Have
          Not Elected To Establish A State Exchange And Whose
          Populations Tend To Experience The Greatest Health
          Risks. ...............................................................................6

     B.     Eliminating Access To The Premium Tax Credit For FFE
          State Residents Will Exacerbate Already-Existing
          Income-Based, Racial, And Ethnic Health Disparities
          That Affect The Populations Of FFE States Compared To
          The Rest Of The Nation. ..............................................12

iv

C.      Because Most Of The FFE States Also Have Opted Out Of Expanding Their State Medicaid Programs, The Near-Poor In Those States Are Entirely Dependent On The Premium Tax Credit To Afford Health Insurance Coverage...........................................................................................13

II.     BECAUSE OF THE PROVEN NEXUS BETWEEN INSURANCE COVERAGE AND HEALTH STATUS, THE ACA WAS INTENDED TO ACHIEVE NEAR-UNIVERSAL HEALTH INSURANCE COVERAGE IN ALL STATES........................21

        A.      The Overriding Purpose Of The ACA Was To Enact National Health Reform, Specifically By Ensuring The Availability Of Affordable Health Insurance Coverage For All Americans. ............................................................21

                1.      The Purpose Of The ACA Was To Enact Comprehensive Health Reform On A National Scale. ....................................21

                2.      The ACA's Structure Underscores That Exchanges Exist As A *National* Public Health Intervention To Connect Americans To Affordable Coverage.....................................23

        B.      Eliminating The Premium Tax Credits And Thus Diminishing The Affordability And Likelihood Of Insurance In The Very States Whose Residents Most Need Coverage Would Eviscerate The Public Health Goals Of The ACA..........................................................................25

        C.      This Court Should Affirm The District Court's Order To Avoid Conflicting With The Express Purpose Of The ACA And Causing Absurd Results..................................................26

CONCLUSION .................................................................................27

APPENDIX A:  LIST AND DESCRIPTION OF *AMICI CURIAE* ....................29

APPENDIX B:  DATA TABLES ..........................................................35

Table 1:  Number and Characteristics of Nonelderly Residents of Federally-Facilitated Exchange vs. State-Based Exchange States in 2013 ..................................................................35

Table 2:  Estimated Number of People Receiving Federal Premium Tax Credits, Average Monthly Value of Tax Credits, and Annual Value of Tax Credits in Federally-Facilitated Exchange States as of April 2014 ..................................36

Table 3:  Health Insurance Coverage by Age in 34 States Electing Not to Establish a State-based Exchange..........................38

Table 4:  Economic and Health Insurance Status of Minority Populations: States Electing State-based Exchanges versus States Electing Not to Establish a State-based Exchange ........................................................................39

Table 5:  Key Health Indicators of State Residents:  States Electing to Establish a State-based Exchange versus Electing to Use the Federally-Faciliated Exchanges.......................40

CERTIFICATE OF COMPLIANCE WITH D.C. CIRCUIT RULE 29(D) REGARDING SEPARATE BRIEFING ........................................42

CERTIFICATE OF COMPLIANCE...................................................................43

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................7

*Comm'r v. Brown*, 380 U.S. 563 (1965)..............................................................27

*Halbig, et al. v. Burwell, et al.*, 758 F.3d 390 (D.C. Cir. 2014) .......................4, 5

*In Re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631 (1978) ..........................27

*King, et al. v. Burwell, et al.,* 759 F.3d 358 (4th Cir. 2014) ................................5

*Kloeckner v. Solis*, 133 S. Ct. 596 (2012)...........................................................26

*United States v. Kirby*, 74 U.S. 482 (1868) ........................................................27

## RULES

D. C. Circuit Rule 26.1 ........................................................................................ ii

D.C. Circuit Rule 28(a)(1) .................................................................................. iii

D.C. Circuit Rule 29 .............................................................................................1

D.C. Circuit Rule 29(b)......................................................................................... ii

Fed. R. App. P. 26.1 ............................................................................................. ii

Fed. R. App. P. 29 .................................................................................................1

Fed. R. App. P. 29(a) ............................................................................................ ii

Fed. R. App. P. 29(c)(5).........................................................................................2

## STATUTES

42 U.S.C. §18041(c)(1)(B)(i) and (ii)....................................................................7

ACA § 1312(d), codified at 42 U.S.C. § 18032(d) (2011) ...................................24

ACA § 1501(a)(2), codified at 42 U.S.C. § 18091(2) (2011)...............................21

ACA § 1502(a)(2)(E), codified at 42 U.S.C. § 18091(2)(E) ...............................22

ACA § 3001, codified at 42 U.S.C. § 280j (2011) ...............................................22

ACA § 4001(a), codified at 42 U.S.C. § 300u-10 (2011).....................................22

ACA § 4004(a), codified at 42 U.S.C. § 300u-12(a) (2011) ................................22

## CONGRESSIONAL MATERIALS

S. Con. Res. 6, 111th Cong., 155 Cong. Rec. S2164–02 (2009)......................6, 15

## OTHER AUTHORITIES

Amy Burke, Arpit Misra, and Steven Sheingold, *Premium Affordability, Competition, and Choice in the Health Insurance Marketplace, 2014*, Office of the Assistant Secretary for Planning and Evaluation (ASPE), HHS, June 18, 2014 (http://aspe.hhs.gov/health/reports/2014/Premiums/2014MktPlacePr emBrf.Pdf) ........................................................................................36, 38

Andrew P. Wilper, *et al.*, *Health Ins. and Mortality in US Adults*, AM. J. PUB. HEALTH, Dec. 2009, at 2289. .............................................................17

Benjamin D. Sommers, M.D., Ph.D., et al., *Health Reform and Changes in Health Insurance Coverage in 2014*, New Eng. J. Med., Aug. 28, 2014, at 867, http://www.nejm.org/doi/full/10.1056/NEJMsr1406753 ...........................20, 21

Benjamin D. Sommers, MD, PhD; Sharon K. Long, PhD; and Katherine Baicker, PhD, *Changes in Mortality after Massachusetts Health Care Reform:  A Quasi-experimental Study*, Ann. Intern. Med., May 2014, at 585, http://annals.org/article.aspx?articleid=1867050 ..............................................19

* Center for Disease Control and Prevention's 2013 Behavioral Risk Factor Surveillance System, http://www.cdc.gov/brfss/annual_data/annual_2013.html.........................40, 41

Comm. on the Consequences of Uninsurance; Bd. on Health Care Servs. (HCS); & Inst. of Med. (IOM), A SHARED DESTINY: COMMUNITY EFFECTS OF UNINSURANCE (The National Academies Press ed. 2003).......................................................................................18, 19

* Committee on the Consequences of Uninsurance; Bd. on Health Care Services (HCS) & Inst. of Med. ("IOM"), CARE WITHOUT COVERAGE:  TOO LITTLE, TOO LATE (The National Academies Press ed. 2002) .............................................................................. 16, 17, 18

Health Insurance Marketplace:  January Enrollment Report for the Period:  October 1, 2013 – Feb. 1, 2014 (Dep't Health & Human Serv. Feb. 12, 2014) ...........................................................................................4

J. Michael McWilliams, *Health Consequences of Uninsurance Among Adults in the United States: Recent Evidence and Implications*, MILBANK Q, June 2009, at 443. ........................................................17

John Z. Ayanian, *et al.*, *Unmet Health Needs of Uninsured Adults in the United States*, JAMA, Oct. 25, 2000, at 2061. ............................................17

KAISER FAMILY FOUNDATION, *Births of Low Birthweight as a Percent of All Births by Race/Ethnicity*, http://kff.org/other/state-indicator/low-birthweight-by-raceethnicity/ (last visited Oct. 13, 2014) ................................................................................................40

KAISER FAMILY FOUNDATION, *Infant Mortality Rate (Deaths per 1,000 Live Births), Linked Files, 2007-2009*, http://kff.org/other/state-indicator/infant-death-rate/ (last visited Oct. 13, 2014) ...................................40

KAISER FAMILY FOUNDATION, *Number of Births*, http://kff.org/other/state-indicator/number-of-births/ (last visited Oct. 13, 2014) ..............................................................................................40

Michelle Andrews, *Deaths Rising for Lack of Health Ins., Study Finds*, N.Y. Times, Feb. 26, 2010, http://prescriptions.blogs.nytimes.com/2010/02/26/deaths-rising-due-to-lack-of-insurance-study-finds/?_php=true&_type=blogs&_r=0 .............................................15

National Health and Nutrition Examination Survey ("NHANES"), 2011-2012 (Dep't Health & Human Serv. Centers for Disease Control and Prevention Nat'l Center for Health Statistics 2012) ....................13

NATIONAL WOMEN'S LAW CENTER, *People in Medically Underserved Areas (%)*, http://hrc.nwlc.org/status-indicators/people-medically-underserved-areas (last updated June 7, 2010).................................41

* U.S. CENSUS BUREAU, 2013 American Community Survey,http://factfinder2.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t .....................................................................3, 6, 35

* U.S. CENSUS BUREAU, Current Population Survey (2014), CPS Table Creator, http://www.census.gov/cps/data/cpstablecreator.html .............39

U.S. Census Bureau Intercensal Population Estimates as of July 1, 2010, http://www.census.gov/popest/data/intercensal/state/state2010.html ...............41

*Amici curiae* Public Health Deans, Chairs, and Faculty submit this brief in support of Appellee Burwell,[1] in her official capacity as Secretary of the Department of Health and Human Services. Public Health Deans, Chairs, and Faculty urge this Court to affirm the District Court's order granting Summary Judgment to Defendant-Appellee Sebelius.

## STATEMENT OF IDENTITY, INTEREST OF THE *AMICI CURIAE*, AND SOURCE OF AUTHORITY TO FILE

*Amici curiae* are deans, departmental chairs, and faculty members of public health and public health law. *Amici* include deans, chairs, and faculty from some of the leading schools of public health in the United States listed in Appendix A. *Amici curiae* are engaged in the policy and science of protecting and improving the health of communities through education, promotion of healthy lifestyles, and research to reduce disease and prevent injury. *Amici* believe that the public's health will be adversely affected if the decision of this Court's original panel is not overturned and the District Court's order is not affirmed. This brief is filed with the consent of all parties and pursuant to Federal Rule of Appellate Procedure 29 and U.S. Court of Appeals for the D.C. Circuit Rule 29.

---

[1] Original Appellee Kathleen Sebelius, named in her official capacity as Secretary of the Department of Health and Human Services, resigned on June 9, 2014 and was replaced by Sylvia Mathews Burwell.

1

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTION

Pursuant to Rule 29(c)(5), Fed. R. App. P., Public Health Deans, Chairs, and Faculty state that no party or person other than *amici* and their counsel participated in or contributed money for the drafting of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Based upon the incontrovertible evidence that health insurance coverage improves access to health care and health, Congress structured the Patient Protection and Affordable Care Act of 2010 ("ACA") to provide near-universal access to affordable insurance. To ensure that coverage is affordable, the ACA creates a federal Health Insurance Premium Tax Credit ("Premium Tax Credit") that is projected to benefit approximately 26.7 million Americans who otherwise lack public or private health insurance and have qualifying incomes.[2] An estimated 18 million children and adults – nearly 70% of this 26.7 million-person total – reside in states that for either political or practical reasons have chosen to use the federally-facilitated exchange ("FFE") for linking lower-income residents with affordable health insurance coverage.[3]

The argument advanced by Plaintiffs-Appellants – accepted by two-thirds of the original panel in its July 22, 2014 decision and then vacated by the Court for *en banc* review – completely undermines the law's fundamental goal of near-

---

[2] *See* U.S. CENSUS BUREAU, 2013 American Community Survey,http://factfinder2.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t.
[3] *Id.*

3

universal coverage for all Americans by conditioning Premium Tax Credits on

whether states can and will run a state-based exchange ("SBE").[4]

Thirty-four states – some for political reasons, others out of practical

considerations – have chosen to use the FFE.[5]  The FFE states are home to

approximately two-thirds of the American population.  Residents of states using

the FFE are poorer – and in worse health – than those who live in states that have

established a SBE.  If this Court accepts the majority ruling of the original panel

and overturns the lower court decision, millions of children and adults will

---

[4] The majority in the panel decision held that "the ACA unambiguously restricts the section 36B subsidy to insurance purchased on Exchanges 'established by the State.'"  *Halbig, et al. v. Burwell, et al.*, 758 F.3d 390, 394 (D.C. Cir. 2014).  The dissent noted that "[t]his case is about Appellants' not-so-veiled attempt to gut the [ACA]."  *Id.* at 412-13.

[5] The 34 FFE states include the seven partnership exchange states (Arkansas, Delaware, Illinois, Iowa, Michigan, New Hampshire, and West Virginia) and the 27 states whose exchanges are run fully by the FFE in 2014:  Alabama, Alaska, Arizona, Florida, Georgia, Indiana, Kansas, Louisiana, Maine, Mississippi, Missouri, Montana, Nebraska, New Jersey, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Wisconsin, and Wyoming.  Health Insurance Marketplace:  January Enrollment Report for the Period:  Oct. 1, 2013 – Feb. 1, 2014, 22–24 (Dep't Health & Human Serv. Feb. 12, 2014) [hereinafter HHS Report].

Fourteen states (plus the District of Columbia) have implemented their own SBEs: California, Colorado, Connecticut, Hawaii, Kentucky, Maryland, Massachusetts, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont and Washington. *Id.*  Idaho and New Mexico are federally supported SBEs for 2014; they are using the FFE website platform for 2014.  *Id.*

4

continue to be uninsured.  Indeed, Plaintiff-Appellants' position suggests that in

designing the ACA, Congress decided to roll the dice on the American people,

when in fact the entire legislative fabric of the ACA points in the opposite

direction.  Because of the intimate nexus between insurance coverage, health care

access, and health, a decision upholding the original panel's decision in favor of

the Plaintiffs-Appellants will irretrievably compromise the ACA's public health

improvement goals by eliminating access to affordable insurance in the FFE states

for those with lower incomes.  The Court should consider and adopt the panel's

dissent, which noted that "the proposed judgment of the majority defies the will of

Congress and the permissible interpretations of the agencies to whom Congress has

delegated the authority to interpret and enforce the terms of the ACA . . ." *Id.* at

427.  The Court should also consider the unanimous panel decision in *King, et al.*

*v. Burwell, et al.* – decided on the same day as the panel's decision in this case –

where the court deferred to the agency's determination below as "a permissible

exercise of the agency's discretion."  *Id.*, 759 F.3d 358, 363 (4th Cir. 2014).

Accordingly, this Court should affirm the District Court's Order to preserve

access to Premium Tax Credits for millions of otherwise eligible taxpayers living

in the 34 FFE states – a total of 18 million people.[6]

## ARGUMENT

**I.    ELIMINATING ACCESS TO THE PREMIUM TAX CREDIT FOR RESIDENTS OF THE 34 STATES THAT HAVE NOT ELECTED TO ESTABLISH A STATE EXCHANGE WILL HARM POPULATION HEALTH AND DEFEAT THE PUBLIC HEALTH GOALS OF THE ACA.**

### A.    The ACA Rests On A Population-Wide Health Goal Of Near-Universal Access To Insurance – A Goal Of Special Importance To Residents Of States That Have Not Elected To Establish A State Exchange And Whose Populations Tend To Experience The Greatest Health Risks.

The ACA rests on a fundamental premise:  universal coverage is vital to improving the health of the American population.  That this premise was front and center in Congress, even at the earliest point in the debate over health reform, is without question.[7]  Yet Plaintiffs-Appellants would deny affordable insurance to millions simply because they happen to live in one of 34 states that has elected not to establish a state Exchange and thus rely on the FFE either wholly or as State

_____

[6] *See* U.S. CENSUS BUREAU, 2013 American Community Survey, http://factfinder2.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t.

[7] *See* S. Con. Res. 6, 111th Cong., 155 Cong. Rec. S2164–02 (2009) (Senate Concurrent Resolution 6 – Expressing the Sense of Congress that National Health Care Reform Should Ensure that the Health Care Needs of Woman and All Individuals in the United States are Met).

Partners.[8]  About two-thirds of the nation's population – about 200 million people – live in the 34 FFE states.[9]

Premium Tax Credits bear no resemblance to a state grant-in-aid program such as Medicaid, in which states have considerable discretion over the reach of the intervention.  Instead, the Premium Tax Credits made available under the ACA are part of federal tax policy, which the United States Supreme Court has emphasized as nationally uniform in nature.  *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).  To deny access to Premium Tax Credits simply because of an individual's place of residence will not only leave tens of millions without access to affordable coverage, but will further exacerbate the racial, ethnic, and income-based health disparities that already exist between the populations of states that rely on the FFE for philosophical or practical reasons and those states that for reasons of philosophy plus technical capability are willing and able to operate their own Exchanges.

––––––––––––––––––––

[8] Oregon, New Mexico, and Nevada have established a state Exchange but use the federally-facilitated Exchange IT platform for open enrollment 2015.

[9] A total of 37 states use the FFE, but three of these states – Oregon, Nevada, and New Mexico – have elected to establish an Exchange but also to use the FFE for operational purposes in the individual market, as provided under 42 U.S.C. §18041(c)(1)(B)(i) and (ii).  These SBEs are federally-supported but are not treated as FFE states under the law.

7

Depriving people of federal assistance – simply because their state happens to use the FFE – would produce cruel and absurd results that are contrary to the law.  **Figure 1** shows all states that have not elected to establish a SBE and that use the FFE, either wholly or as a State Partner.

**Figure 1: State-Based Exchanges and Federally-Facilitated Exchanges For Open Enrollment 2015**



As **Table 1** further shows, these 34 states accounted for 171.6 million out of 264.8 million nonelderly U.S. residents in 2013.  The 34 FFE states also accounted for two-thirds – 84.8 million – of the 150.5 million U.S. residents whose 2013 incomes fell within the eligibility range for Premium Tax Credits  (between 100%

and 400% of the poverty level[10]) in 2013.  The FFE states are home to the nation's

most vulnerable residents.  As of April 2014, **Table 2** shows the FFE states

accounted for nearly 4.7 million[11] U.S. residents who received premium tax

credits, 87% percent of all tax credit recipients.  Census data show that prior to

implementation of the Exchange, residents of the 34 FFE states accounted for 30.6

million out of 45.2 million uninsured U.S. residents – 68% of the uninsured.

Moreover, **Table 3** also shows that being uninsured affected a larger proportion of

the population of the FFE states (15.1% compared to the national average of

14.5%).  As evidenced by **Figure 2**, the scatterplot graph below, the FFE states

exhibited a higher rate of un-insurance prior to implementation of the Exchange.

_____

[10] In Medicaid expansion states, the income threshold for Premium Tax Credits begins at 138% of the Federal Poverty Level ("FPL") (the point at which Medicaid income eligibility ceases) and phases out at 400% of the FPL.  In states that have not expanded Medicaid to cover all non-elderly adult residents with incomes below 138% of the FPL, the threshold income eligibility for Premium Tax Credits begins at 100% and phases out at 400% of the FPL.

[11] Table 2 includes Idaho and New Mexico, which as of the time of the study, had elected to establish a SBE but relied on the federal IT platform.  Together these states account for slightly less than 100,000 of the 4.7 million premium subsidy recipients in FFE states.

**Figure 2: Percent Uninsured Residents in Federally-Facilitated Exchange States in 2013**



Were Premium Tax Credits to be terminated in the FFE states, coverage disparities would inevitably widen over time as residents of FFE states fail to match the coverage gains in SBE states – precisely the opposite effect from what Congress intended.

Included among the uninsured populations living in FFE states are especially vulnerable sub-populations, as shown in **Tables 3 and 4**. In 2013, the uninsured

10

population in the FFE states included 8.7 million older adults, ages 45 to 64.

(**Table 3**).  Indeed, in 2013, over two-thirds of the nation's 12.8 million uninsured

older adults – who tend to have more serious health conditions and need more

assistance with medical bills – resided in FFE states.  (*Id.*)  Their age and more

vulnerable health status mean that these older adults face extraordinary difficulty

finding affordable coverage without subsidies, and yet they are too young to

qualify for Medicare.

**Table 4** shows that the FFE states were home to the majority of low and

moderate income and uninsured African Americans.  **Table 4** also shows that the

majority of low-to-moderate income and uninsured Hispanic Americans lived in

the 34 FFE states.  As further depicted in **Table 4,** prior to Exchange

implementation, Non-Hispanic African Americans and Hispanic Americans who

reside in one of the 34 FFE states were more likely to be both low-to-moderate

income and uninsured.

Were Premium Tax Credits suddenly to be taken from the residents of the 34

FFE states who had received such assistance as of April 2014, **Table 2** shows that

more than 4.6 million people would lose tax credits, at a value of nearly $15

billion.  Because being without another source of minimum essential coverage is a

prerequisite for qualifying for Exchange coverage, virtually all of these individuals

would revert to uninsured status.

11

**B.    Eliminating Access To The Premium Tax Credit For FFE State Residents Will Exacerbate Already-Existing Income-Based, Racial, And Ethnic Health Disparities That Affect The Populations Of FFE States Compared To The Rest Of The Nation.**

Because poverty and poor health are more concentrated among the FFE states, eliminating Premium Tax Credits for residents of these states carries especially grave implications.  Population health disparities between the FFE and SBE states were clearly evident even before implementation of the ACA.  Compared to residents of SBE states, residents of the 34 FFE states are more likely to report being unable to see a doctor due to cost (16.6% versus 14.6%).  (**Table 5**.)  They are more likely to have infants born at low birth weight (8.5% versus 7.5%), a known risk factor for infant death and disability.  (*Id.*)  FFE state residents are more likely to have been told by a physician that they have diabetes (10.6% versus 9.5%), a condition that leads to health problems such as kidney disease, blindness, heart attacks, loss of limbs, and ultimately death.  (*Id.*)  FFE residents also are more likely to be overweight (65.3% versus 60.9%), a major risk factor for a host of health conditions.  (*Id.*)  FFE state residents are more likely to live in communities identified as medically underserved by the federal government as a result of elevated poverty and health risks and a shortage of primary care access (12.4% versus 10.1%).  (*Id.*).

12

The role that insurance plays in addressing these population health disparities is extensively documented.  Improved infant health, better management of obesity, and reduced health risks from conditions such as diabetes are associated with access to timely, appropriate and quality health care, which in turn is significantly associated with health insurance.  For example, evidence drawn from the 2011-2012 National Health and Nutrition Examination Survey shows that 32% of uninsured people with diabetes remain undiagnosed, compared with 15% of people with diabetes who have insurance.[12]  Health coverage can facilitate the medical care to diagnose diabetes and take actions to treat it to avoid more serious health consequences.

> **C.    Because Most Of The FFE States Also Have Opted Out Of Expanding Their State Medicaid Programs, The Near-Poor In Those States Are Entirely Dependent On The Premium Tax Credit To Afford Health Insurance Coverage.**

The loss of access to Premium Tax Credits in the FFE states would compound an already bad situation – especially for 3.9 million near-poor adults with incomes between 100% and 138% of the FPL (*see* **Table 2**) who live in FFE states.  **Figure 3** shows that, as of the end of January 2014, 22 of the 34 FFE states

---

[12] *See* National Health and Nutrition Examination Survey ("NHANES"), 2011-2012 (Dep't Health & Human Serv. Centers for Disease Control and Prevention Nat'l Center for Health Statistics 2012).

have also opted out of the ACA Medicaid expansion, leaving nonelderly adults

with incomes up to 138% of the FPL and not otherwise eligible for traditional

coverage without any pathway to Medicaid,[13] which was amended by the ACA to

reach virtually all nonelderly low income adults with incomes up to 138% of the

FPL.

**Figure 3: Marketplace Status and Medicaid Expansion For Open Enrollment 2015**



In the states that do not expand Medicaid, the one avenue to affordable

health insurance coverage for adults with incomes between 100% and 138% of the

---

[13] By contrast all SBE states (except Idaho) have expanded Medicaid to cover this population. Thus, in these states, residents with incomes between 138% and 400% of the FPL are eligible for the Premium Tax Credit.

FPL is through Premium Tax Credits, which in the non-expansion states become available once the 100% of FPL threshold is reached.  But if this Court upholds the original panel's ruling, state residents in FFE states with incomes between 100% and 138% FPL will lose access to this critical federal assistance to obtaining coverage as well.  Irrefutable evidence shows that access to health insurance promotes individual and community health and that Congress was aware of this nexus in enacting the ACA.

In the earliest stages of the ACA debate, Members of Congress focused on the nexus between health reform and population health.[14]  The seminal body of research is found in a multi-year study undertaken by the Institute of Medicine ("IOM"),[15] whose 2002 exploration of the consequences of being uninsured led to a pivotal conclusion:  more than 18,300 American adults died annually because

---

[14] *See supra* note 7, at S2165 ("Whereas the Institute of Medicine estimates that the cost of achieving full health insurance coverage in the United States would be less than the loss in economic productivity from existing coverage gaps…."); *see also* Michelle Andrews, *Deaths Rising for Lack of Health Ins., Study Finds*, N.Y. Times, Feb. 26, 2010, http://prescriptions.blogs.nytimes.com/2010/02/26/deaths-rising-due-to-lack-of-insurance-study-finds/?_php=true&_type=blogs&_r=0 (summarizing the IOM research and reporting on a later update of its estimates).

[15] The IOM is the medical/public health component of the Congressionally-chartered National Academy of Sciences.

they lacked health insurance.[16]  The IOM Committee found, *first,* that health

insurance is associated with better health outcomes among adults and with the

receipt of appropriate care across a range of preventive, chronic and acute care;

*second*, that older adults with chronic conditions are the most likely to realize the

health benefits of coverage because of their greater need for health care; *third*, that

populations facing the highest health risks (those with low incomes and members

of racial and ethnic minority groups) stand to benefit the most from coverage,

thereby leading to a reduction in disparities in health and health care; *fourth,* that

comprehensive coverage (of the type that ultimately would be made available

through subsidized, qualified health plans offered on an exchange) was most

strongly associated with improved health; and *finally,* that were uninsured adults

given stable coverage, their health would improve over time.[17]  The notion that

based on these findings, Congress would leave access to Premium Tax Credits to

the happenstance of state policy and politics is absurd.

  The IOM's research was echoed in subsequent studies.  One, which updated

the earlier IOM estimate regarding the impact of being uninsured on life and

---

[16] Committee on the Consequences of Uninsurance; Bd. on Health Care Services
(HCS) & Inst. of Med. ("IOM"), CARE WITHOUT COVERAGE:  TOO LITTLE, TOO
LATE, 163 (The National Academies Press ed. 2002) [hereinafter "CARE WITHOUT
COVERAGE"].
[17] *Id.* at 91–103.

health, significantly increased the earlier estimate – from 18,314 excess deaths in 2001 among Americans ages 25-64 to 35,327 in 2005.  This study concluded that the uninsured are 1.4 times more likely to die from preventable causes.[18]  This disparity in deaths could be attributed in part to the fact that uninsured adults are less likely than adults to receive timely, appropriate, and quality health care.[19]  Subsequent studies found that the absence of health insurance significantly affected the health outcomes of patients with the most serious conditions, such as cancer, principally because of delayed diagnosis.[20]

A range of studies have shown that uninsured adults, especially those without insurance for over a year, have more unmet health needs than those adults with stable coverage, because they encounter greater barriers to early detection and treatment of chronic illnesses, delay seeking medical care, and even forgo necessary care for potentially serious symptoms.[21]  The IOM studies show that

---

[18] Andrew P. Wilper, *et al.*, *Health Ins. and Mortality in US Adults*, AM. J. PUB. HEALTH, Dec. 2009, at 2289, 2292.

[19] CARE WITHOUT COVERAGE, *supra* note 16, at 47–90 (reviewing the empirical literature on the association between insurance and health care and health outcome).

[20] John Z. Ayanian, *et al.*, *Unmet Health Needs of Uninsured Adults in the United States*, JAMA, Oct. 25, 2000, at 2061.

[21] *Id.*; CARE WITHOUT COVERAGE, *supra* note 16, at 47–90; J. Michael McWilliams, *Health Consequences of Uninsurance Among Adults in the United States:  Recent Evidence and Implications*, MILBANK Q, June 2009, at 443, 485.

uninsured patients with chronic diseases are less likely to receive appropriate care to manage their conditions and have worse clinical outcomes than insured patients.[22]  The IOM studies also show that uninsured patients who are hospitalized are more likely to die in the hospital, receive fewer services, and experience adverse medical events due to negligence than insured patients.[23]  Further, the IOM studies have found that uninsured patients are more likely to experience worse health outcomes than among those with private insurance coverage.[24]

Finally, the IOM research extended beyond the individual impact of being uninsured and considered community-wide effects of populations at elevated risk for being uninsured.  The IOM concluded that communities with high rates of uninsured have worse access to health care and report higher proportions of low income families with fair to poor health, as opposed to communities with low uninsured rates.[25]  Hospitalization rates for conditions amenable to early treatment with ambulatory care are higher in communities experiencing a greater proportion

_____

[22] CARE WITHOUT COVERAGE, *supra* note 16, at 57–71.

[23] *Id.* at 73–76.

[24] *Id.* at 80–82.

[25] Comm. on the Consequences of Uninsurance; Bd. on Health Care Servs. (HCS); & Inst. of Med. (IOM), A SHARED DESTINY:  COMMUNITY EFFECTS OF UNINSURANCE 140 (The National Academies Press ed. 2003) [hereinafter "COMMUNITY EFFECTS OF UNINSURANCE"].

18

of lower income and uninsured residents, including both access problems and greater severity of illness.[26]  Finally, the incidence of vaccine-preventable and communicable disease was shown to be higher in areas with high uninsured rates that experience chronic underfunding of local public health agencies.[27]

Cognizant of this strong, well-documented correlation between insurance coverage and health,[28] Congress enacted the ACA to improve the public health by providing near-universal coverage.  Studies published subsequent to ACA enactment have borne out the wisdom of Congress' decision to improve access to health care through insurance reform.  In this regard, two seminal studies are instructive.  The first study examined the impact on adult mortality of Massachusetts' 2006 health reform law, which is widely regarded as the prototype for the ACA.[29]  That study found that adults in Massachusetts experienced a 2.9% drop in mortality in the wake of health reform compared to individuals in other states with similar socioeconomic characteristics.  The most dramatic results were

---

[26] *Id.* at 142.

[27] *Id.* at 147.

[28] *See supra* notes 7 and 14 and accompanying text.

[29] Benjamin D. Sommers, MD, PhD; Sharon K. Long, PhD; and Katherine Baicker, PhD, *Changes in Mortality after Massachusetts Health Care Reform:  A Quasi-experimental Study*, Ann. Intern. Med., May 2014, at 585, http://annals.org/article.aspx?articleid=1867050 (Accessed online Oct. 14, 2014).

seen in Massachusetts counties with the lowest incomes and the highest rates of uninsured adults.  The authors concluded that such results could be attributed to significant gains in health insurance coverage and access to health care for conditions such as diabetes or cardiovascular disease that threaten life and health but are amenable to treatment.

The second study, which was nationwide, directly examined the effects of the ACA's first open enrollment period on health insurance coverage and access to health care.  This study found more than a five percentage point drop between Fall 2013 and April 2014 in the uninsured rate among U.S. adults.[30]  The drop in the proportion of uninsured Americans coincided with the 2013-2014 open enrollment period, meaning that the first open enrollment period under the new law is associated with a 25% decline in the proportion of nonelderly Americans who are uninsured.  The most significant gains were seen among sub-populations at highest risk for being uninsured, and gains in coverage for people with incomes falling within the premium subsidy eligibility range were significant in all states.  Expanded insurance coverage was accompanied by significant, measurable gains

---

[30] Benjamin D. Sommers, M.D., Ph.D., et al., *Health Reform and Changes in Health Insurance Coverage in 2014*, New Eng. J. Med., Aug. 28, 2014, at 867, 871, http://www.nejm.org/doi/full/10.1056/NEJMsr1406753 (Accessed online Oct. 14, 2014).

20

in access to care and a significant decline in the proportion of adults who reported

being unable to afford medical care.[31]

## II. BECAUSE OF THE PROVEN NEXUS BETWEEN INSURANCE COVERAGE AND HEALTH STATUS, THE ACA WAS INTENDED TO ACHIEVE NEAR-UNIVERSAL HEALTH INSURANCE COVERAGE IN ALL STATES.

### A. The Overriding Purpose Of The ACA Was To Enact National Health Reform, Specifically By Ensuring The Availability Of Affordable Health Insurance Coverage For All Americans.

#### 1. The Purpose Of The ACA Was To Enact Comprehensive Health Reform On A National Scale.

Aware of the link between coverage and health outcomes, Congress set

national public health improvement goals that hinged on achieving near-universal

coverage.  The ACA's text evinces Congressional intent to raise the health of the

entire American population – not just those people who happened to live in states

that operated their own exchanges without federal assistance.  For instance,

Congressional findings make clear that being uninsured burdens the national

economy and interstate commerce.  ACA § 1501(a)(2), codified at 42 U.S.C.

§ 18091(2) (2011).  By extending the coverage mandate to all Americans,

Congress intended to improve the national health and reduce the annual costs of

$207 billion to the national economy from the poorer health and shorter lifespan of

---

[31] *Id.* at 870.

the uninsured.  ACA § 1502(a)(2)(E), codified at 42 U.S.C. § 18091(2)(E).

Making affordable coverage available nationwide would enable Congress to

achieve national health reform over time.

Congress signaled its intent in the ACA to couple a nationwide system of

affordable insurance with other national strategies to improve the public health.

For instance, the ACA directed the Secretary of Health and Human Services

("Secretary") to identify national priorities to establish a national strategy to

improve the delivery of health care services, patient health outcomes, and

population health.  ACA § 3001, codified at 42 U.S.C. § 280j (2011).  The ACA

directed the President to establish the National Prevention, Health Promotion, and

Public Health Council to coordinate and lead all federal departments and agencies

on prevention, wellness and health promotion practices, the public health system,

and integrative health care strategy nationwide.  ACA § 4001(a), codified at 42

U.S.C. § 300u-10 (2011).  Congress further directed the Secretary to undertake a

"national public-private partnership for a prevention and health promotion outreach

and education campaign to raise public awareness of health improvement across

the life span."  ACA § 4004(a), codified at 42 U.S.C. § 300u-12(a) (2011).  These

national programs demonstrate that the ACA is a comprehensive health care

reform effort on a truly national scale.

2.     **The ACA's Structure Underscores That Exchanges Exist As A** *National* **Public Health Intervention To Connect Americans To Affordable Coverage.**

The health insurance exchanges are one element of the ACA's national health care reform strategy.  Under the ACA, Congress used the concept of an exchange to connect the uninsured to affordable coverage throughout the nation. The Plaintiffs-Appellants' position that seeks to deny Premium Tax Credits to an otherwise eligible taxpayer based on her state of residence contravenes Congressional intent, defies logic, and leads to absurd results.

Were Congress naïve enough to assume that states would operationalize an exchange due solely to the alleged carrot/stick of subsidies, the ACA would not include an FFE fallback.[32]  Rather, to bring about national health care reform under the ACA, Congress designed the FFE to serve as an operational fallback to accomplish what a state either could not or would not do – operate an exchange for its citizens.[33]  Irrespective of the entity running the exchange machinery, however, Congress intended the ACA to transform the national market for health insurance.

---

[32] Medicaid and CHIP, for example, give states the option to participate in the program without any federal default system.

[33] For instance, seven states have partnered with the FFE to create a hybrid State Partnership Marketplace because of the practical and operational difficulties with building their own exchange structure.  Two states, Idaho and New Mexico, elected to establish SBEs; however, for 2014, they are using the FFE website

(continued…)

Furthermore, Congress preserved (albeit in regulated form) the health

insurance market outside the exchange structure, thereby ensuring that any

individual who wished to discharge the personal responsibility obligation by

buying coverage on the open market could do so.  ACA § 1312(d), codified at 42

U.S.C. § 18032(d) (2011) (expressly preserving the operation of the private

insurance market outside the exchange).  What is evident from the fact that the

ACA preserved a non-exchange health insurance market is that while exchanges

ostensibly offer a marketplace for any individual or small business desiring to

purchase coverage, their true mission is to ensure a means of connecting people

who need financial assistance with subsidized or unsubsidized health plans.

Viewed in this light, the existence of a national structure to undergird the

ACA's exchange provisions – including the FFE fallback system for states that

either could not or would not establish their own exchanges – makes perfect sense.

Indeed, the position taken by Plaintiff-Appellants would bring about absurd results

contrary to the ACA's purpose – not only by punishing residents of states that

refuse to establish an exchange for political reasons, but also residents of states that

---

platform.  Oregon and Maryland elected to establish SBEs, but their respective
state website platforms, Cover Oregon and Maryland Health Connection, have
experienced a number of technical problems that may require them to also rely on
federal support for their exchanges in open enrollment 2015.

24

ardently desire to operate their own exchange yet must depend on a federal

platform for technical reasons.  Given the myriad technical issues that have arisen

as the states have attempted to construct and operationalize the web-based platform

necessary to implement the ACA-mandated exchanges, to argue that Congress

meant to place entire populations at heightened health risk simply because their

states rely on the FFE is legally and factually untenable.  Accepting Plaintiffs-

Appellants' myopic reading of the ACA would clearly and simply thwart the

overriding stated goal of the legislation.

### B.    Eliminating The Premium Tax Credits And Thus Diminishing The Affordability And Likelihood Of Insurance In The Very States Whose Residents Most Need Coverage Would Eviscerate The Public Health Goals Of The ACA.

Congress envisioned that all Americans in need of assistance to obtain

affordable coverage would receive it, thus benefiting the entire nation.  The

coverage mandate, applicable to all states – not just those with a SBE – is a central

pillar of how Congress sought to ensure near-universal coverage.  Since creating a

robust yet affordable health insurance marketplace was seen as the key to near-

universal coverage, Congress recognized that federal subsidies would be essential

to ensure affordability for residents of all states.

As described above, the FFE states, as a group, are poorer and have

markedly worse population health status than the SBE states.  This is especially

true for minority populations in these states.  They are also, for the most part, the

25

same states that have eschewed federally-funded expansion of their Medicaid programs.  They are the very states whose populations most need access to affordable health insurance, but who would be the *least* likely to achieve it in the absence of Premium Tax Credits.

The overriding statutory purpose of the ACA is clear.  Interpreting a provision of the law in a manner that would essentially *eliminate* access to affordable health insurance for low income residents of two-thirds of the states – that happen to be those very states where residents are poorer and have markedly poorer health – would lead to an absurd result.

### C. This Court Should Affirm The District Court's Order To Avoid Conflicting With The Express Purpose Of The ACA And Causing Absurd Results.

An interpretation of an individual clause that produces absurdity in another part of the statute is not a permissible interpretation.  *Kloeckner v. Solis*, 133 S. Ct. 596, 606–07 (2012).  A statute's nominal plain language must give way if it would conflict with Congress's manifest purposes or lead to absurd results.  "This Court, in interpreting the words of a statute, has some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute . . . ."  *In Re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978) (quoting *Comm'r v. Brown*, 380 U.S. 563, 571 (1965) (internal quotations

26

omitted); *see also United States v. Kirby*, 74 U.S. 482, 486–87 (1868) ("All laws should receive a sensible construction . . . [and] [t]he reason of the law in such cases should prevail over its letter").

In this case, the Premium Tax Credit is a critical element of the ACA to ensure that lower income Americans across the nation can afford coverage.  If two-thirds of otherwise eligible Americans lose their Premium Tax Credit simply because of their state residence, the goals of the ACA – to improve the public health and bring about near-universal coverage – will be thwarted.

## CONCLUSION

For the reasons set forth above and in the brief of the Appellee, *Amici Curiae* Public Health Deans, Chairs, and Faculty urge the Court to affirm the District Court's order.

Dated:  November 3, 2014                    Respectfully submitted,


                                            /s/ H. Guy Collier
                                            H. Guy Collier *
                                            Ankur J. Goel*
                                            Cathy Z. Scheineson
                                            Amandeep S. Sidhu
                                            Lauren A. D'Agostino
                                            MCDERMOTT WILL & EMERY LLP
                                            The McDermott Building
                                            500 North Capitol Street, NW
                                            Washington, DC 20001
                                            Telephone: 202.756.8000
                                            Facsimile: 202-756-8087
                                            gcollier@mwe.com

27

Counsel for *Amici Curiae*
* Counsel of Record

## APPENDIX A:  LIST AND DESCRIPTION OF *AMICI CURIAE*

### DEANS

**Craig H. Blakely, PhD, MPH**
**Professor and Dean**
School of Public Health and Information Sciences
University of Louisville

**Paul Brandt-Rauf, DrPH, MD, ScD**
**Professor and Dean**
School of Public Health
Environmental & Occupational Health Sciences
University of Illinois at Chicago

**Paul D. Cleary, Ph.D.**
**Dean and Anna M.R. Lauder Professor of Public Health**
Yale School of Public Health

**José F. Cordero, MD, MPH**
**Professor and Dean**
Graduate School of Public Health
Medical Sciences Campus
University of Puerto Rico

**Gregory Evans, Ph.D., M.P.H.**
**Dean**
Jiann-Ping Hsu College of Public Health
Georgia Southern University

**John R. Finnegan, Jr., PhD.**
**Professor and Dean**
University of Minnesota School of Public Health
Assistant Vice President for Public Health at the University of Minnesota

**Lynn R. Goldman, M.D., M.S., M.P.H.**
**Dean, Michael and Lori Milken Dean**
**Professor of Environmental and Occupational Health**
GW Milken Institute School of Public Health
Dean, School of Public Health and Health Services

29

**Richard S. Kurz, PhD**
**Professor and Dean**
UNTHSC School of Public Health

**Robert F. Meenan, MD, MPH, MBA**
**Dean**
Boston University School of Public Health

**Philip C. Nasca, MS, Ph.D., FACE**
**Dean, School of Public Health**
Professor of Epidemiology
University at Albany

**Michael G. Perri, PhD, ABPP**
**Dean, College of Public Health and Health Professions**
The Robert G. Frank Endowed Professor of Clinical and Health Psychology
University of Florida

**Martin A. Philbert, PhD**
**Dean and Professor**
School of Public Health
University of Michigan

**George G. Rhoads, MD, MPH**
**Interim Dean**
Rutgers School of Public Health

**Edwin Trevathan, M.D., M.P.H.**
**Dean, College for Public Health and Social Justice**
Professor of Epidemiology, Pediatrics, and Neurology
Saint Louis University

## CHAIRS

**Robert W. Blum, MD**
**William H. Gates Sr. Chair**
Department of Population, Family & Reproductive Health
Johns Hopkins Bloomberg School of Public Health

**Kyle L. Grazier, Dr.P.H., M.P.H.**
**Chair, Department of Health Management and Policy**
School of Public Health
University of Michigan

**Paula Lantz, Ph.D.**
**Chair of the Department of Health Policy**
Professor of Health Policy
GW Milken Institute School of Public Health

**Laura Rudkin, Ph.D.**
**Professor and Chair**
Centennial Chair in Preventive Medicine & Community Health
The University of Texas Medical Branch

**Oladele A. Ogunseitan, PhD, MPH**
**Professor of Public Health**
**Professor of Social Ecology**
**Chair, Department of Population Health & Disease Prevention**
Director of Research Education, Training and Career Development
Institute for Clinical and Translational Science
University of California, Irvine

**José Szapocznik, Ph.D.**
**Professor & Chair, Department of Public Health Sciences**
Professor of Architecture, Psychology, and Counseling Psychology & Educational
Research
Director, Miami Clinical & Translational Science Institute
University of Miami Miller School of Medicine

31

# PROFESSORS

**Taylor L. Burke, J.D., L.L.M.**
**Associate Professor of Health Policy**
GW Milken Institute School of Public Health
Department of Health Policy

**John A. Graves, Ph.D.**
**Assistant Professor**
Vanderbilt University School of Medicine
Department of Health Policy
Institute for Medicine and Public Health

**Peter Jacobson, JD, MPH**
**Professor of Health Law and Policy**
Director, Center for Law, Ethics, and Health
University of Michigan School of Public Health

**Leighton Ku, Ph.D., M.P.H**
**Professor of Health Policy**
GW Milken Institute School of Public Health
Department of Health Policy

**Jeffrey Levi, Ph.D.**
**Executive Director**
Trust for America's Health
Professor of Health Policy
George Washington University

**Jay Maddock, Ph.D.**
**Professor & Director**
Office of Public Health Studies
University of Hawaii at Manoa

**Wendy K. Mariner**
**Edward R. Utley Professor of Health Law**
**School of Public Health**
**Professor of Law**
School of Law
Boston University

**Michelle M. Mello, J.D., Ph.D.**
**Professor of Law, Stanford Law School**
**Professor of Health Research and Policy**
Stanford University School of Medicine

**Sara Rosenbaum, J.D.**
**Harold and Jane Hirsh Professor of Health Law and Policy**
GW Milken Institute School of Public Health
Department of Health Policy

**Benjamin Sommers, M.D., Ph.D.**
**Assistant Professor of Health Policy and Economics**
Harvard School of Public Health
Health Policy and Management

**Katherine Swartz, PhD**
**Professor of Health Economics and Policy**
Department of Health Policy and Management
Harvard School of Public Health

**Joel Teitelbaum, J.D., LL.M.**
**Associate Professor and the Vice Chair for Academic Affairs**
GW Milken Institute School of Public Health
Department of Health Policy

**Jane Hyatt Thorpe, J.D.**
**Associate Professor of Health Policy**
GW Milken Institute School of Public Health
Department of Health Policy

**Susan F. Wood, Ph.D.**
**Associate Professor of Health Policy and of Environmental & Occupational Health**
GW Milken Institute School of Public Health
Department of Health Policy

## APPENDIX B:  DATA TABLES

**Table 1:  Number and Characteristics of Nonelderly[34] Residents of Federally-Facilitated Exchange vs. State-Based Exchange[35] States in 2013[36]**

| Population Criteria | "Federal" Includes Partnership States But Excludes Original State-Based States | | Total United States |
| --- | --- | --- | --- |
| | State-Based Exchange States | Federally-Facilitated Exchange States | |
| Number of States, Including D.C. | 17 | 34 | 51 |
| Total nonelderly population (millions) | 93.2 | 171.6 | 264.8 |
| People with incomes below 100% of poverty (millions) | 15.0 | 29.7 | 44.7 |
| % of people below 100% of poverty | 16.1% | 17.3% | 16.9% |
| People with incomes between 100%-400% of poverty (millions) | 42.4 | 84.8 | 127.2 |

---

[34] Universe consists of the civilian non-institutionalized population for whom poverty status is determined.

[35] Includes states that have elected to establish a state exchange, but are using the federal IT platform.

[36] Based on analyses of the U.S. CENSUS BUREAU, 2013 American Community Survey, http://factfinder2.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t.

**Table 2: Estimated Number of People Receiving Federal Premium Tax Credits, Average Monthly Value of Tax Credits, and Annual Value of Tax Credits in Federally-Facilitated Exchange States as of April 2014[37,38,39]**

| Federally-Facilitated Exchange State | Estimated Number of People Receiving Tax Credits (1000s) | Percent of Exchange Enrollees Receiving Tax Credits | Average Monthly Tax Credit Value ($/person) | Estimated Annual Value of Tax Credits (million $)[40] |
|---|---|---|---|---|
| TOTAL, FFE States | 4,685.8 | 87% | $264 | $14,821 |
| Alabama | 83.2 | 85% | $258 | $258 |
| Alaska | 11.3 | 88% | $413 | $56 |
| Arizona | 92.5 | 76% | $159 | $176 |
| Arkansas | 39.1 | 89% | $293 | $137 |
| Delaware | 11.4 | 81% | $263 | $36 |
| Florida | 895.2 | 91% | $278 | $2,987 |
| Georgia | 275.4 | 87% | $287 | $948 |
| Idaho | 70.0 | 91% | $207 | $174 |
| Illinois | 167.5 | 76% | $202 | $406 |
| Indiana | 117.9 | 89% | $336 | $475 |
| Iowa | 24.5 | 83% | $242 | $71 |
| Kansas | 45.0 | 78% | $223 | $121 |
| Louisiana | 89.6 | 88% | $314 | $337 |
| Maine | 39.8 | 89% | $344 | $164 |
| Michigan | 237.1 | 87% | $246 | $700 |
| Mississippi | 57.8 | 94% | $415 | $288 |

---

[37] Based on April 2014 data a reported in Amy Burke, Arpit Misra, and Steven Sheingold, *Premium Affordability, Competition, and Choice in the Health Insurance Marketplace, 2014*, Office of the Assistant Secretary for Planning and Evaluation (ASPE), HHS, June 18, 2014 (http://aspe.hhs.gov/health/reports/2014/Premiums/2014MktPlacePremBrf.Pdf).
[38] Universe consists of the civilian non-institutionalized population for whom poverty status is determined.
[39] Includes Idaho and New Mexico, which as of the date of the ASPE study, had elected to establish a SBE but used the federal IT platform.
[40] Estimated annual value is the product of the number of tax credit recipients times the average value times 12 months.

| Federally-Facilitated Exchange State | Estimated Number of People Receiving Tax Credits (1000s) | Percent of Exchange Enrollees Receiving Tax Credits | Average Monthly Tax Credit Value ($/person) | Estimated Annual Value of Tax Credits (million $)[40] |
|---|---|---|---|---|
| Missouri | 129.5 | 85% | $286 | $444 |
| Montana | 31.5 | 85% | $246 | $93 |
| Nebraska | 37.4 | 87% | $214 | $96 |
| New Hampshire | 31.0 | 76% | $290 | $108 |
| New Jersey | 135.9 | 84% | $317 | $517 |
| New Mexico | 25.3 | 78% | $214 | $65 |
| North Carolina | 325.4 | 91% | $300 | $1,171 |
| North Dakota | 9.0 | 84% | $218 | $24 |
| Ohio | 131.5 | 84% | $250 | $394 |
| Oklahoma | 54.7 | 79% | $202 | $133 |
| Pennsylvania | 257.6 | 81% | $246 | $761 |
| South Carolina | 104.1 | 87% | $283 | $354 |
| South Dakota | 11.8 | 89% | $271 | $38 |
| Tennessee | 121.1 | 78% | $195 | $283 |
| Texas | 616.4 | 84% | $233 | $1,723 |
| Utah | 73.6 | 86% | $159 | $140 |
| Virginia | 177.4 | 82% | $254 | $541 |
| West Virginia | 17.1 | 85% | $302 | $62 |
| Wisconsin | 127.2 | 90% | $316 | $482 |
| Wyoming | 11.1 | 93% | $422 | $56 |

**Table 3: Health Insurance Coverage by Age in 34 States Electing Not to Establish a State-based Exchange[4142]**

|  | Residents of Federally-Facilitated Exchange States | Total United States |
|---|---|---|
| Total Uninsured Population (2013) (mil) | 30.6 | 45.2 |
| Millions of uninsured adults, 18-44 years (2013) | 17.9 | 26.7 |
| Millions of uninsured adults, 45-64 years (2013) | 8.7 | 12.8 |
| % of people uninsured, all ages (2013) | 15.1% | 14.5% |

[41] Universe consists of the civilian non-institutionalized population for whom poverty status is determined.
[42] These items are based on analyses of the ACS. *See id.*

38

**Table 4:  Economic and Health Insurance Status of Minority Populations: States Electing State-based Exchanges versus States Electing Not to Establish a State-based Exchange**

| | Residents of State-Based Exchange States | Residents of Federally-Facilitated States | Total United States |
|---|---|---|---|
| **Non-Hispanic African-Americans** | | | |
| Millions of Non-Hispanic African-Americans between 100%-400% of poverty (2013) [43] | 4.0 | 15.0 | 19.0 |
| % of Non-Hispanic African-Americans who are between 100%-400% of poverty (2013) | 46.4% | 51.5% | 50.3% |
| Millions of Uninsured Non-Hispanic African-Americans between 100%-400% of poverty (2013) | 0.5 | 2.6 | 3.1 |
| % of Non-Hispanic African-Americans between 100%-400% of poverty  who are uninsured (2013) | 12.7% | 17.6% | 16.6% |
| **Hispanics** | | | |
| Millions of Hispanics between 100%-400% of poverty (2013) | 13.4 | 18.4 | 31.7 |
| % of Hispanics who are between 100%-400% of poverty (2013) | 59.1% | 58.3% | 58.6% |
| Millions of Uninsured Hispanics between 100%-400% of poverty (2013) | 2.9 | 5.3 | 8.2 |
| % of Hispanics between 100%-400% of poverty  who are uninsured (2013) | 21.5% | 29.1% | 25.9% |

---

[43] *See* Census Bureau's March 2014 Current Population Survey ("CPS") (indicating income and health insurance status in 2013).  The data was tabulated using the U.S. CENSUS BUREAU, Current Population Survey (2014), CPS Table Creator, http://www.census.gov/cps/data/cpstablecreator.html.

**Table 5: Key Health Indicators of State Residents: States Electing to Establish a State-based Exchange versus States Electing to Use the Federally-Facilitated Exchanges**

| Population Criteria | Residents of State-Based Exchange States | Residents of Federally-Facilitated Exchange States | Total United States |
|---|---|---|---|
| % of adults reporting they were unable to see a doctor in the past twelve months because of cost (2013) [44] | 14.6% | 16.6% | 15.9% |
| Infant mortality rate (deaths per 1,000 births) (2009) [45] | 5.6 | 7.1 | 6.6 |
| % of infants born with low birth weight, under 2500 grams (2010) [46] | 7.5% | 8.5% | 8.1% |
| % of adults who have ever been told by a doctor that they have diabetes (2013) [47] | 9.5% | 10.6% | 10.3% |
| % of adults who are overweight or obese (2013) [48] | 60.9% | 65.3% | 63.8% |

[44] *See* Center for Disease Control and Prevention's 2013 Behavioral Risk Factor Surveillance System, http://www.cdc.gov/brfss/annual_data/annual_2013.html.

[45] *See* National Center for Health Statistics' Linked 2009 Birth/infant Death data set. *See* KAISER FAMILY FOUNDATION, *Infant Mortality Rate (Deaths per 1,000 Live Births), Linked Files, 2007-2009*, http://kff.org/other/state-indicator/infant-death-rate/ (last visited Oct. 13, 2014). To compute aggregate infant mortality rates, we weighted each state's number of live births in 2010. *See* KAISER FAMILY FOUNDATION, *Number of Births*, http://kff.org/other/state-indicator/number-of-births/ (last visited Oct. 13, 2014).

[46] *See* Centers for Disease Control and Prevention. *See* KAISER FAMILY FOUNDATION, *Births of Low Birthweight as a Percent of All Births by Race/Ethnicity*, http://kff.org/other/state-indicator/low-birthweight-by-raceethnicity/ (last visited Oct. 13, 2014). To compute aggregate low weight birth rates, we weighted each state's number of live births in 2010. *See* KAISER FAMILY FOUNDATION, *Number of Births*, supra note 41.

[47] *See* Center for Disease Control and Prevention's 2013 Behavioral Risk Factor Surveillance System, http://www.cdc.gov/brfss/annual_data/annual_2013.html.

| Population Criteria | Residents of State-Based Exchange States | Residents of Federally-Facilitated Exchange States | Total United States |
|---|---|---|---|
| % of people living in Medically Underserved Areas (2010) [49] | 10.1% | 12.4% | 11.6% |

[48] Based on reported weights and heights and computed body mass indices greater than 25 kg/meter squared as reported in the CDC's 2013 Behavioral Risk Factor Surveillance System, http://www.cdc.gov/brfss/annual_data/annual_2013.html.

[49] Based on the state percentage living in medically underserved areas in 2010. *See* NATIONAL WOMEN'S LAW CENTER, *People in Medically Underserved Areas (%)*, http://hrc.nwlc.org/status-indicators/people-medically-underserved-areas (last updated June 7, 2010). To aggregate total percentages, we weighted each state's percentage by the number of people in the state based on US Census Bureau Intercensal Population Estimates as of July 1, 2010, http://www.census.gov/popest/data/intercensal/state/state2010.html.

41

## <u>CERTIFICATE OF COMPLIANCE WITH D.C. CIRCUIT RULE 29(D) REGARDING SEPARATE BRIEFING</u>

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certify that a separate brief is necessary because the substantive argument contained herein is different from that presented by the parties and other *amici*. *Amici curiae* are deans, chairs, and faculty members of some of the leading public health schools in the United States. *Amici curiae* are engaged in the policy as well as the science of protecting and improving the health of communities. Thus, *amici curiae* are particularly well-suited to discuss the resulting public health implications, as well as to provide the Court with background on the literature that establishes the direct link between health insurance and health status.

Dated:  November 3, 2014                    Respectfully submitted,

                                                                          /s/   H. Guy Collier
                                                                          H. Guy Collier
                                                                          MCDERMOTT WILL & EMERY LLP
                                                                          500 North Capitol Street, NW
                                                                          Washington, DC 20001
                                                                          Telephone: 202.756.8000
                                                                          Facsimile: 202-756-8087
                                                                          gcollier@mwe.com
                                                                          Counsel for *Amici Curiae*

42

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **6,997** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in Times New Roman, 14-point type.

Dated:  November 3, 2014                    Respectfully submitted,


                                            /s/  H. Guy Collier
                                            H. Guy Collier
                                            MCDERMOTT WILL & EMERY LLP
                                            The McDermott Building
                                            500 North Capitol Street, NW
                                            Washington, DC 20001
                                            Telephone: 202.756.8000
                                            Facsimile: 202-756-8087
                                            gcollier@mwe.com
                                            Counsel for *Amici Curiae*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 3rd day of November 2014, I caused the

foregoing *Amicus Curiae* Brief of Public Health Deans, Chairs, and Faculty in

Support of Appellee to be electronically filed using the Court's CM/ECF system,

which served a copy of the document on all counsel of record in the case.

/s/   Ankur J. Goel
Ankur J. Goel
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Telephone: 202.756.8000
Facsimile: 202-756-8087
agoel@mwe.com
Counsel for *Amici Curiae*